IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


- - - -

MARK GARNETT,                          )

      Plaintiff,                   )

-V-                                    ) CASE NO. 5:19CV02864
                            JUDGE JOHN R. ADAMS
AKRON CITY SCHOOL DISTRICT BOARD)
OF EDUCATION, ET AL.,
      Defendants.                  )


- - - -


The video teleconference deposition of MARK
GARNETT, the Plaintiff herein, being called by the
Defendants as if upon cross-examination under the
statute, and taken before Megan A. Medved, a Notary
Public within and for the State of Ohio, pursuant to the
agreement of counsel, on Thursday, September 3rd, 2020,
at 9:30 a.m., at the Offices of Tackla Court Reporting,
LLC, 1020 Ohio Savings Plaza, 1801 East 9th Street, City
of Cleveland, County of Cuyahoga, and the State of Ohio.

- - - -

Page 2

1    APPEARANCES:

2    On behalf of the Plaintiff:

3         By:  Edward Gilbert, Esq.

4              Edward L. Gilbert Co., LPA

5              One Cascade Plaza, Ste. 825

6              Akron, Ohio 44308

7              Egilbert@edwardlgilbert.com

8              (330)376-8855

9

10   On behalf of the Defendants:

11        By:  John McLandrich, Esq.

12             Mazanec, Raskin & Ryder

13             100 Franklin's Row

14             34305 Solon Road

15             Solon, Ohio 44139

16             Jtm@mrrlaw.com

17             (440)248-7906

18

19

20

21

22

23

24

25

```
 1                        INDEX

 2  APPEARANCES ...................................... 2

 3  MARK GARNETT

 4  CROSS-EXAMINATION BY MR. McLANDRICH ............... 4

 5  REPORTER CERTIFICATE ............................. 188

 6  EXHIBITS:

 7  Defendant's Exhibits K, C, I, G, B, J & L.

 8  DEFENDANT'S:

 9  K. E-mail Correspondence .......................... 58

10  C. Garnett Civil Service Appeal 3/27/19 ........... 99

11  I. Collective Bargaining Agreement ................ 104

12  G. 2017-2018 Building and Grounds Staffing ........ 105

13  B. Defendants' First Set of Interrogatories ....... 134

14  J. SERS Documents ................................ 144

15  L. Garnett Handwritten Notes ...................... 185

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2                     - - - -

 3        MARK GARNETT, of lawful age, the Plaintiff

 4    herein, having been first duly sworn, as hereinafter

 5          certified, deposes and says as follows:

 6                     - - - -

 7        CROSS-EXAMINATION OF MARK GARNETT

 8  BY MR. McLANDRICH:

 9  Q.      Good morning, Mr. Garnett.

10  A.      Good morning.

11  Q.      As you probably know, I'm John McLandrich.  I

12  represents the Defendants in the lawsuit that you've

13  filed and so today I'm going to ask you questions about

14  the lawsuit.  If there's anything that I ask you that

15  you don't understand, please let me know before you

16  answer the question.  Otherwise if you answer I'll

17  assume that you understood the question.  Okay?

18  A.      Okay.

19  Q.      All right.  And if at any time the link breaks

20  down or you can't hear me, please let us know.  Wave

21  your hands or something so that we can make sure that we

22  can get our communication going back on again.  All

23  right?

24  A.      Okay.

25  Q.      All right.  And so I know you sat through the
```

1   other depositions that were done by phone and the same

2   sort of thing here where we have to be careful to not

3   talk over each other to help the court reporter.  So

4   I'll not talk over you and if you could let me get the

5   entire question out before you answer, even though you

6   might think you know what the full question will be,

7   that will help her as well.  Obviously, just answer

8   verbally as opposed to shrugging your shoulders or

9   nodding or shaking your head, that sort of thing will

10  help the court reporter as well.  Okay?

11  A.      Okay.

12  Q.      I know from reviewing the recordings that you

13  have some problem with your eyesight, and I know that

14  you're going to be trying to bring up the documents on

15  your tablet, so if you have any problems seeing the

16  documents or bringing them up, please let us know that

17  as well.  Do you also have a laptop that you could bring

18  the documents up on that might be a bigger screen and

19  would be easier for you to read?

20  A.      No.

21  Q.      All right.  Well, then let's just get started

22  and we'll do the best that we can.  Also if you need a

23  break at any time to use the restroom or anything, just

24  let me know.  If there's a question pending I'd like you

25  to just answer the question before you take a break, but

1    otherwise if you need breaks we'll take some because

2    this is not a marathon and is not meant to make you

3    uncomfortable in any way.  All right?

4    A.    Okay.

5    Q.    Thank you.  Would you just start with your full

6    name and address for the record?

7    A.    Mark Garnett, 1358 Hardesty Boulevard.

8    Q.    And how old are you now, Mr. Garnett?

9    A.    I'm 59.

10   Q.    And so in looking through the records it seems

11   as if you've got some significant health conditions that

12   are continuing and looking through the records I saw an

13   indication that you now need a kidney transplant.  Is

14   that right?

15   A.    Yes.

16   Q.    When was it determined that you need a kidney

17   transplant?

18   A.    That was in January of 2019.

19   Q.    Are you scheduled for that?

20   A.    Yes.

21   Q.    Are they still looking to find a kidney?

22   A.    Yes.

23   Q.    And if at any time I'm not talking loud enough

24   for you to hear me, please let me know.

25   A.    Okay.

1   Q.      And as I understand it you're doing dialysis?

2   A.      Yes.  Three times a week.

3   Q.      What other types of treatments are you receiving

4   at this point?  What kind of treatments and for what

5   conditions are you receiving treatment?

6   A.      You mean like medication?

7   Q.      Well, not just medication.  We'll talk about

8   that, but are you seeing any therapists or doctors on a

9   regular basis?

10  A.      Yes.  I see two therapists on a regular basis.

11  Q.      Who are you seeing and what for?

12  A.      I see Tomoko.  She's at Portage Path Behavioral

13  Health.

14  Q.      How do you spell that name, do you know?

15  A.      No, I don't.

16  Q.      Okay.  How often do you see -- is it a her?

17  A.      Yes.  I see her every two weeks.

18  Q.      Is that just talk therapy?

19  A.      Yes.  At this time, yes.

20  Q.      And how long are those sessions each two weeks?

21  A.      An hour.

22  Q.      When was the last time that you saw her?

23  A.      This Tuesday.  This past Tuesday.

24  Q.      And who is the other therapist that you see?

25  A.      I'd have to ask my wife her name.  I just

1  started seeing her maybe a few months ago.  She's also

2  like a psychiatrist.  Do you want me to get that name

3  real quick?

4  **Q.      Yes, please.**

5  A.      Okay.  Hold on one second.  Dr. Azoury, and

6  that's Akron General.

7  **Q.      And what do you see her for?**

8  A.      For dealing with the hangman noose situation,

9  the PTSD.  And I've been seeing her for trying to sleep

10 also.

11 **Q.      Is that just talk therapy or does she prescribe**

12 **you medication?**

13 A.      She had prescribed some medication but there

14 were some things that -- I was just recently in the

15 hospital, that The Cleveland Clinic wanted me to stop.

16 I'm trying to think of that medication.  There's

17 medication that I was taking but they wanted me to stop

18 at the beginning of August when I had a visit in the

19 hospital.  They were thinking it was making me have

20 seizures.  I can tell that you medication, if you'd

21 like.

22 **Q.      Please.**

23 A.      Let me find it.  Hold on one second.

24 Escitalopram.

25 **Q.      Can you spell it?**

1   A.      I just happen to remember the name of it.

2   E-S-C-I-T-A-L-O-P-R-A-M.

3   **Q.      Give me that one more time, if you could.**

4   A.      E-S-C-I-T-A-L-O-P-R-A-M.

5   **Q.      Okay.  Thank you.  And is that a psychiatric**

6   **medication?**

7   A.      Yes.  And there's another one that I take,

8   Trazodone.  I'm looking for that because I can't spell

9   that one either.  But it's Trazodone.

10  **Q.      Okay.  Is that to help you sleep?**

11  A.      Yes.  That's to help me relax and there's

12  another one that I take -- I can get that.  Hold on.

13  Prazosin.  P-R-A-Z-O-S-I-N.  That's for nightmares.

14  **Q.      The Prazosin, or however you say that, how often**

15  **do you take that?**

16  A.      Every night.

17  **Q.      And how about the Trazodone?**

18  A.      Trazodone I should be taking it every night but

19  just recently I've been taking off some of those things

20  because, like I said, in the hospital they thought it

21  was causing seizures.

22  **Q.      Which ones did they take you off?**

23  A.      The Escitalopram.

24  **Q.      Did they take you off any others?**

25  A.      Trazodone is something that's in discussion

1    right now because that doesn't really seem to work.

2    That was supposed to help me sleep but I haven't been

3    sleeping, so I'm in discussion with the therapist now as

4    far as whether or not I'm going continue that.

5    **Q.      When was the last time that you saw Dr. Azoury?**

6    A.      Since the pandemic.  It might have been two

7    months since I've seen her.  I'm not really sure but as

8    far as just going off my memory, I think it might have

9    been two months ago.

10   **Q.      Do you know how to spell her last name?**

11   A.      No, I don't.

12   **Q.      Okay.  She's through Akron General, though?**

13   A.      Yes.  Wellness Center I think.

14   **Q.      Do you have any appointments set up with her?**

15   A.      Yes.  I'm pretty sure that I do.  I think my

16   next appointment I might be going in actually to see her

17   but we did on the phone about two months ago.

18   **Q.      Any other physicians or therapists that you're**

19   **currently treating with?**

20   A.      There's my primary care doctor, Dr. Amanabu.

21   **Q.      I presume you won't be able to spell that one.**

22   A.      I might be able to take a shot at it.

23   A-M-A-N-A-B-U.  If that's not it, it's close.

24   **Q.      Okay.  And is he on his own, or Akron General,**

25   **or where is he?**

1    A.      He's on his own.

2    **Q.      How often are you consulting with him?**

3    A.      Right now maybe once every couple of months.  I

4    think I'll be seeing him at the end of this month.

5    **Q.      And what conditions is he monitoring you or**

6    **helping you with?**

7    A.      He's primary care.  Just like blood pressure.

8    He's helping with blood pressure and just questions and

9    maybe if I had to go see a physician he could recommend

10   that.

11   **Q.      Okay.  Anyone else that we haven't discussed**

12   **that you're seeing on a reoccurring basis?**

13   A.      There probably is, I just can't remember off the

14   top of my head.

15   **Q.      Sure.  If you think of somebody else while we're**

16   **talking about other things, just interrupt and let me**

17   **know.  All right?**

18   A.      Okay.

19   **Q.      So at this point I assume that you're not**

20   **working at all.  Are you working at all?**

21   A.      No.  I'm not working.  No.

22   **Q.      And the last place that you worked was when you**

23   **were working for The Akron Public Schools, right?**

24   A.      Yes.

25   **Q.      Do you recall what your last day of active work**

Page 12

1  **was?**

2  A.      Are you meaning --

3  **Q.      When you were actually at the school performing**

4  **custodial duties.**

5  A.      No, I don't.

6  **Q.      Fair to say that you were off on leave for a**

7  **substantial time before you received your disability**

8  **retirement?**

9  A.      Yes.  That's fair.

10  **Q.      Do you know whether you're considered to still**

11  **be on medical leave?**

12  A.      Am I still considered to be on medical leave?

13  **Q.      Yes.  When you're on this disability benefit, do**

14  **you know whether you're technically still considered to**

15  **be on medical leave as opposed to being a terminated**

16  **employee?**

17  A.      I don't understand the question.

18  **Q.      Sure.  So somebody can be completely terminated**

19  **from their employer.  In other words, where they have no**

20  **ongoing relationship with their employer.  You**

21  **understand that, right?**

22                  MR. GILBERT:  Objection.

23  A.      Yes.

24  BY MR. McLANDRICH:

25  **Q.      And then before when you were on medical leave**

1    you were not physically working but you were still on

2    the payroll at Akron Public Schools.  Do you remember

3    that?

4    A.      FMLA.

5    Q.      Yeah.  Right.

6    A.      Okay.

7    Q.      On FMLA.  Do you recall that?

8    A.      Yes.

9    Q.      All right.  And so now you applied for and

10   received a disability benefit through SERS, correct?

11   A.      Yes.

12   Q.      And do you know whether the school carries you

13   as being on a disability leave when you're receiving

14   that SERS disability benefit?

15                   MR. GILBERT:  Objection.  You can

16   answer if you know.

17   A.      I don't know.

18   BY MR. McLANDRICH:

19   Q.      In terms of your employment with Akron Public

20   Schools, what position did you start off in, do you

21   recall?

22   A.      Yeah.  I started off as eight-hour custodial

23   worker.

24   Q.      Were you like a five-hour or anything before you

25   became an eight-hour?

 1   A.      No.

 2   Q.      **Do you recall when you started as eight-hour?**

 3   A.      About March of 2002.

 4   Q.      **Did you receive a promotion at some point?**

 5   A.      Yes.

 6   Q.      **And what was your first promotion?**

 7   A.      First promotion was probably assistant

 8   custodian.

 9   Q.      **Do you recall roughly when you became an**

10   **assistant custodian?**

11   A.      I'm thinking 2014.  Somewhere around there.

12   Q.      **Did you have to take a civil service exam for**

13   **that?**

14   A.      Yes.

15   Q.      **And eventually you were promoted again?**

16   A.      Yes.  To head custodian.

17   Q.      **And what year was that, if you recall?**

18   A.      2016.

19   Q.      **Is that an proximate date?**

20   A.      Yeah.  About 2016.

21   Q.      **Okay.  And, again, you took a civil service exam**

22   **to become head custodian?**

23   A.      Yes.  That I recall.

24   Q.      **Okay.  And then based on how you performed on**

25   **those exams you were selected to become the head**

1  **custodian?**

2  A.      I don't know how that worked.  I took the exam

3  and ended up getting the position.

4  Q.      **All right.  And what building were you at when**

5  **you were assistant custodian?**

6  A.      I was at Crouse.

7  Q.      **And then when you became head you stayed at**

8  **Crouse?**

9  A.      Actually, they made me stay at Crouse.  I was

10  made to stay at Crouse.

11  Q.      **How did they make you stay at Crouse?**

12  A.      When a position opens up and a building a free,

13  then you go to that building.  Say Innes was open, then

14  I would go to the next building in line.  There's

15  buildings in line that custodians can go to.  Crouse was

16  not the next building in line.  There was another school

17  but instead of offering me the next school that was in

18  line, they told me to stay at Crouse.  That's how I

19  ended up being the assistant and head custodian at

20  Crouse.

21  Q.      **What was this next building in line?  What was**

22  **that?**

23  A.      I can't remember that, but there was another

24  building before Crouse.

25  Q.      **So as an assistant custodian, or an eight-hour**

1  **custodian, and certainly as head custodian you'd been a**
2  **member of a union, correct?**
3  A.      Yes.
4  **Q.      And the union contract controls the bidding with**
5  **respect to moving from building to building, correct?**
6                    MR. GILBERT:  Objection.  You can go
7  ahead and answer if you know.
8  A.      I'm not sure.
9  BY MR. McLANDRICH:
10 **Q.      Okay.  So you don't know whether there's a**
11 **process in the union contract for when a building or a**
12 **position becomes vacant whether there's a process to bid**
13 **for that particular opening?**
14 A.      I'm not sure about that.  Are you speaking on
15 why I stayed at Crouse?
16 **Q.      That's certainly one reason, yes.**
17 A.      As I said earlier, you don't bid on a building
18 when you become the head custodian.  You take the next
19 building in line.  The bidding process to my
20 understanding is something different, like a bid sheet,
21 but you don't get a bid sheet when you first become a
22 head custodian.  When you first become a head custodian,
23 the next building in line that needs a custodian you're
24 assigned that building or offered that building.  I
25 wasn't offered the building at all.  I was just told to

1  stay at Crouse.  That's something totally different that

2  we're talking about.

3  **Q.      Who did you have this conversation with that**

4  **told you that you couldn't have the next building?**

5  A.      That was Mike Critchfield.

6  **Q.      What was his position?**

7  A.      Mike Critchfield may have been the custodial

8  coordinator at the time.  Wait a minute.  Let me see.

9  It was a long time ago.  It could have been either Mike

10  Critchfield or John Beverlin.  I'm thinking Mike

11  Critchfield, but it could have been John Beverlin.  I'm

12  thinking Mike Critchfield might have been retired at

13  that time so it could have been John Beverlin.

14  **Q.      Did you ever bid to go to a different building**

15  **other than Crouse?**

16  A.      No.

17  **Q.      Okay.  Do you know if there were ever other**

18  **openings that you could have bid on?**

19  A.      Yes.

20              MR. GILBERT:  At what point, counsel?

21              MR. McLANDRICH:  As head custodian.

22              MR. GILBERT:  You can go ahead and

23  answer if you know.

24  A.      Jumping ahead a little bit, but when I got

25  downgraded in June of 2017 there was a lot of buildings

Page 18

1    that were open to bid on but I couldn't bid on it

2    because of the downgrade that I had.  Matt Frame told me

3    that I couldn't bid on any buildings after that

4    evaluation that I got in June of 2017.

5    BY MR. McLANDRICH:

6    **Q.      All right.  And did you receive any pay cut in**

7    **June of 2017?**

8    A.      A pay cut?

9    **Q.      Yes.**

10   A.      No.  Not that I remember.

11   **Q.      Okay.  In June of 2017 you were already off on**

12   **leave, correct?**

13   A.      No.

14   **Q.      This evaluation that you received was 2018, not**

15   **2017, right?**

16   A.      2018 was a -- they had to redo it.  2017, June

17   of 2017 is when I got downgraded.

18   **Q.      And when you say that you got downgraded, this**

19   **is a performance evaluation that you received from Akron**

20   **Public Schools, correct?**

21   A.      From Tara Bruce.  Yes.

22   **Q.      And when you say "downgraded," there were some**

23   **categories on the evaluation that you were marked below**

24   **satisfactory on.  Is that what you're indicating?**

25   A.      That's correct.

1    Q.       That's what you mean by downgraded, correct?

2    A.       Yes.

3    Q.       You weren't demoted from being the head

4    custodian, correct?

5    A.       No.  It just denied me of opportunity.

6    Q.       And that opportunity you're contending was the

7    opportunity to bid on another building?

8    A.       Correct.

9    Q.       All right.  Prior to receiving that evaluation

10   in June of 2017 had you ever bid on another building?

11   A.       No.

12   Q.       Had you had opportunities to bid on another

13   building prior to that time?

14   A.       Yes.

15   Q.       Sounds like you and Ms. Bruce didn't

16   particularly get along.

17   A.       She didn't care for me.  There was times, and I

18   explained that to Todd Wammes, this was a Dr. Jekyll and

19   Mr. Hyde thing.  One minute she was one way and the next

20   minute she was another way.  If she walked out the door

21   she was nice and when she walked back in the door she

22   wasn't, and I explained that to Todd Wammes.

23   Q.       And this was your perception of the way that she

24   acted toward you, right?

25   A.       Yes.  Nice one minute and totally different the

1    next.

2    **Q.      And what's your understanding of why she was**

3    **like that?**

4    A.      Well, there were times where I felt she was

5    coming on to me, like she wanted to date me, and when I

6    wasn't accepting to the things that she was doing then

7    sometimes she was mean.

8    **Q.      Did she ever ask you out on a date?**

9    A.      She didn't come out and ask me out but there

10   were different things that were going on where she made

11   me feel comfortable, like if I was that kind of person

12   that she would go out with me.

13   **Q.      What did she do or say that led you to believe**

14   **that?**

15   A.      She would often call me in her office.

16   Sometimes when she called me in her office for small

17   talk she would have on like an halter top, and her

18   breasts would be hanging out.  I wouldn't look.  I'd sit

19   down in a chair.  She was always back in the boiler room

20   and there were times where she would call me on the

21   radio to come into a room, and this would be after

22   hours, and when I would go into the room -- she told me

23   she would need me there.  The next thing I know I'm

24   coming into the room on several where she's bent over,

25   and half her butt is showing and she's got thongs

1    hanging out.

2          There were other times -- we have a room in the

3    building where there's very low traffic, room 104.  In

4    room 104 there were two small bathrooms, five-by-five,

5    five-by-six.  And in one of the bathrooms there's like a

6    bed or like a changing table and we had a couple of

7    conversations where she had pulled me and we had a

8    conversations in there.  I remember one-time we kept

9    going in there and I was uncomfortable so I would go --

10   the second time she took me back in that room I stood

11   one foot in the bathroom door, and one foot on the

12   carpet keeping that bathroom door open.

13         There were other times -- she knew I lived right

14   around the corner.  I was walking home one day and she

15   ended up following me, pulled over the curb and said,

16   look Mr. Garnett, you know, I could have gave you a ride

17   and said that seductively.  She followed me around the

18   building.  She followed me around the building, I got on

19   the elevator, she got on the elevator with me, she

20   leaned back with one leg up against the wall as in a

21   submissive position, and after I got off the elevator I

22   was walking through the second floor and walked back

23   down the stairs, she followed me down the stairs.  I go

24   back to the boiler room -- I think she got distracted

25   for a minute and so I go back to the boiler room and in

1   the boiler room we have a side door that leads to an

2   outside chiller area.  It's like a brick wall.  There's

3   no ceiling on that, but it's where our chiller and

4   garage door is.  So since she was distracted -- nobody

5   knows about that door.  You'd really have to look for

6   it.

7          I went outside in that chiller area said, okay,

8   I got away from her.  The next thing I know I see the

9   door opening up.  So she came out to the chiller area,

10  and again leaned up against the wall the same way she

11  did in the elevator, in the submissive position with her

12  hands behind in back and one foot up on the wall.  I may

13  have missed some things.  But these are the kind of

14  things that were going on in the building that made me

15  feel uncomfortable.

16  **Q.      Did she ever ask you for sex?**

17  A.      No.

18  **Q.      And we already discussed she never asked you**

19  **out?**

20  A.      Not with words, but her actions did.

21  **Q.      Did she ever touch you in an inappropriate**

22  **fashion?**

23  A.      No.  She's gotten close, though.

24  **Q.      She's gotten close to you.  Is that what you're**

25  **saying?**

1    A.       Yes.   Those are the times in the small bathroom.

2    **Q.       The conversation in the small bathroom, was it**

3    **about the status of the bathroom?**

4    A.       Actually it seemed like it started off like

5    that, but after that it changed to where we're talking

6    about things that we could have talked about in the

7    cafeteria.

8    **Q.       And were these issues about other items in the**

9    **building?  In other words, other conditions of the**

10   **building?**

11   A.       No.   It was actually about a pool worker.

12   **Q.       But it was something to do with your employment?**

13   A.       It was a conversation that didn't have to take

14   place in the bathroom.

15   **Q.       I understand that, but my question is it had**

16   **something to do with the operation of the Crouse**

17   **Elementary School?**

18   A.       It was about a pool worker.

19   **Q.       Okay.   And the pool workers were working at**

20   **Crouse Elementary School, right?**

21   A.       Yes.

22   **Q.       And when she would call you in her office there**

23   **would be small talk, but there would be also talk about**

24   **the operation of Crouse Elementary School, your job, the**

25   **pool workers and the condition of the building, yes?**

1   A.      Yes.  There used to be a picture that was

2   hanging up on her door where she keeps her coat.  She

3   wanted to make sure that I saw this picture of her that

4   somebody put together.  I think she told me that kids

5   had put it together when we had a conversation about it.

6   Kids had put it together, but it was her head and a body

7   of a girl with a very short mini skirt, long stockings,

8   belly showing, that kind of thing.

9   **Q.      Did you ever complain to anyone at Akron Public**

10  **Schools that you felt Ms. Bruce was propositioning you**

11  **or trying to date you or behaving in an inappropriate**

12  **fashion with respect to any sexual overtones?**

13  A.      I tried, but there were some things that I

14  couldn't say because I figured if I would have said some

15  things they would have taken me right out of the

16  building.

17  **Q.      What do you mean by you tried?**

18  A.      I had a meeting with Todd Wammes and Steve

19  Santangelo.  When I met with them I let them know that

20  she had given me a rose.  I didn't tell them the reason

21  why she gave me a rose.  I did give a reason, but I

22  didn't tell them what I thought, you know, the other

23  reason was.

24  **Q.      All right.  So what was the reason that -- I'm**

25  **sorry.  Go ahead.**

1   A.      I didn't tell them what the other reason was

2   because I felt -- I wanted to shine a light on the

3   situation where they would in their own minds, they

4   would be like, wait a minute, she gave Mr. Garnett a

5   rose, that's inappropriate.  Just to shine a light on

6   some things.  So that was my attempt to at least get the

7   ball rolling or to start where maybe some people would

8   say, okay, wait a minute.  What's going on here?

9   **Q.      Is that the sole attempt that you made?**

10  A.      Yes.

11  **Q.      What reason did you give them at that meeting?**

12  A.      The reason I gave them in my meeting from my

13  best memory was I told them -- I think it was a

14  Saturday, I believe.  I went into the building, worked

15  on my own time.  I took about 38 tables out of the

16  cafeteria.  I scrubbed that cafeteria, I waxed that

17  cafeteria.  I waxed the first floor and I waxed the

18  second floor and I put all of that back together.  She

19  came back and everything was shiny.  So I told them that

20  she probably gave me that rose -- it had something to do

21  with that.  But she never told me why she gave me the

22  rose.  She gave me the rose, I just assumed -- gave her

23  the benefit of the doubt and thought maybe it's for me

24  cleaning up both hallways, waxing them and doing the

25  cafeteria.  I believe that's the reason I told Todd

1   Wammes.

2   Q.      And from that you were hoping they would infer

3   there was something improper about her giving you the

4   rose?

5   A.      I knew it was improper, you know, but I would

6   hope they would see something from that, especially from

7   the other complaints that I was having.

8   Q.      What do you mean from the other complaints that

9   you were having?

10  A.      The complaints that Ms. Bruce -- I mean, I went

11  to Todd Wammes to explain to him about my past, why

12  things were happening in my building the way that they

13  were happening and the reasons for that.

14  Q.      And this conversation that you're talking about

15  with Todd Wammes and Steven Santangelo, that's one of

16  the recordings that you've produced to me through your

17  attorney?

18  A.      Yes.

19  Q.      All right.  So are those recordings that you've

20  produced, are those all the recordings that you made?

21  A.      Yes.

22  Q.      So there's no recordings that you made that

23  weren't produced?

24  A.      No.  That was it.

25  Q.      Do you have some information that would show

Page 27

1   when those various recordings were made?  There were

2   only two of them that were dated.  Is there some way for

3   us to know when these events that are recorded happened?

4   A.      No.  They were done on an old phone.

5   Q.      When you say something like you mentioned before

6   that you were telling Todd Wammes about things that

7   happened to you and your history, I assume you're

8   talking about starting with this 2002 incident when

9   someone reportedly had a hangman's noose, right?

10  A.      Yes.  Yes.

11  Q.      And apparently they also said some things to you

12  that weren't appropriate at that time, correct?

13  A.      Yes.

14  Q.      And then back in 2002 because of that you filed

15  a complaint with the Ohio Civil Rights Commission,

16  correct?

17  A.      Yes.

18  Q.      All right.  And then after that Ohio Civil

19  Rights Commission complaint you filed a civil lawsuit

20  over those events, correct?

21  A.      Yes.

22  Q.      And then you settled that civil lawsuit with the

23  district, correct?

24  A.      Yes.

25  Q.      And executed a release with respect to that

Page 28

1    lawsuit?

2    A.      I'm not sure.

3    Q.      Okay.  But you do recall that you settled that

4    lawsuit?

5    A.      Yes.

6    Q.      Okay.  And then according to the complaint in

7    this matter, the next OCRC that you file is 15 years

8    later in 2017, right?

9    A.      Yes.  What date that was?

10   Q.      2017.

11   A.      Yes.

12                   MR. GILBERT:  You're talking about the

13   OCRC, correct?

14                   MR. McLANDRICH:  Yes.

15   BY MR. McLANDRICH:

16   Q.      And it sounds as if the events in 2002 continue

17   to haunt you.  Is that right?

18   A.      Yes.  Exactly.  That's a fact.

19   Q.      Those events plus other events that occurred in

20   your life effect how you see things that happen to you

21   in the world.  Is that fair?

22   A.      Would you say that again?

23   Q.      Sure.  So I've reviewed your Portage Path

24   records.  Let me be more clear about it and start over.

25   In reviewing the Portage Path records I see where you

1    **revealed to them other things that happen to you during**

2    **your life that you felt were race discrimination outside**

3    **of Akron Public Schools. Fair?**

4    A.      There were some things that -- if you're talking

5    about when I was 6 years old, that was something that I

6    didn't even understand, didn't even know it was race

7    related. Are you talking about the ice cream incident?

8    Q.      **That's one of them, yes.**

9    A.      At that point I didn't even understand that. I

10   didn't know what was going on at that point. I didn't

11   understand that until many years later. If I shared

12   some other things you would have to tell me, because we

13   talk about a lot of stuff.

14   Q.      **Okay. So let's just deal with the 2002 incident**

15   **then.**

16   A.      Okay.

17   Q.      **So the events that happened at APS in 2002 is,**

18   **as we've agreed, continued to haunt you, yes?**

19   A.      Yes.

20   Q.      **And you continue to think about them, continue**

21   **to find it disturbing?**

22   A.      Yes.

23   Q.      **All right. And even all this time later, it's**

24   **18 years later, it's something that you continue to**

25   **speak to your therapist about and seek therapy for?**

Page 30

1  A.      That with other things, yes.

2  **Q.      And the events of 2002 affect how you've seen**

3  **other things that have occurred at APS, right?**

4                    MR. GILBERT:  Objection.  You can go

5  ahead and answer if you know.  Don't try to guess or

6  speculate as to what you're therapist may or may not

7  think.

8  A.      Okay.

9                    MR. McLANDRICH:  I'm not asking about

10  his therapist just to be clear.  Let me ask it over.

11                    MR. GILBERT:  Let me get out my

12  objection.  My objection is that that calls for a

13  medical professional conclusion.  I don't know if this

14  witness is capable of separating that out like you're

15  suggesting, so I'm objecting because it does require

16  medical opinions.  Don't give medical opinions, Mr.

17  Garnett.  If you can answer the question, go ahead and

18  answer.

19  BY MR. McLANDRICH:

20  **Q.      Let me just clarify things here.  At no time am**

21  **I ever asking you to render a medical opinion or legal**

22  **opinion or anything else.  What I want to know is what**

23  **you know.  Okay?**

24  A.      Okay.  I'll try to answer that the best that I

25  can.  Is that okay?

Page 31

1  **Q.      Yes.  Go ahead.**

2                  MR. GILBERT:  What's the question?

3  BY MR. McLANDRICH:

4  **Q.      The question is, how you view other events that**

5  **happened to you at APS, is that affected by the events**

6  **of 2002?**

7                  MR. GILBERT:  Same objection.  Go

8  ahead and answer if you can.

9  A.      Okay.  Let me try to answer this.  When it came

10  time for me to became a head custodian that situation

11  effected me as far as my decision to became a head

12  custodian because I didn't want that hangman noose stuff

13  to happen on my watch.  I became the head custodian

14  because of that situation.  I wanted to make things

15  better.  Whether a person was black, white, male,

16  female, young or old, I wanted to be someone that they

17  could come to in my building.  You're not going to get

18  hangman nooses in my building.  You're not going to hear

19  nigger in my building and you're not going to be

20  disrespected or treated wrong.  Does that answer your

21  question of how that affected me as far as that

22  situation?

23  BY MR. McLANDRICH:

24  **Q.      Well, it's an answer.  That's fine.  We can move**

25  **along and ask more questions.**

Page 32

1    A.      Okay.

2    Q.      **So do you believe that events subsequent to 2002**

3    **occurred to you because of the events of 2002?**

4    A.      You have to say that one more time.  I'm sorry.

5    Q.      **Sure.  Do you think that anything else that's**

6    **happened to you Akron Public School happened because of**

7    **the events of 2002?**

8                    MR. GILBERT:  Objection.

9    A.      Absolutely.

10   BY MR. McLANDRICH:

11   Q.      **Okay.  Tell me what those things are.**

12   A.      In '07, I think somebody mentioned Ken Ferris'

13   name in there deposition.  My best memory, '07, end of

14   September, if I got this right, my mom passes away on a

15   Saturday.  I have an interview Monday with Ken Ferris

16   and Mark Hagan.  Mark Hagan passed away.  I have meeting

17   on Monday with them for a job opportunity for operator

18   one.  This operator one position called for a Class A

19   CDL, which I had one at the time in my wallet.  Instead

20   of him hiring me, he hired two white custodians who

21   didn't have class A CDLs and at that time everybody was

22   talking about Mark Garnett and the hangman situation.  I

23   feel I didn't get the job because of me filing the

24   charge.  There was no other reason.

25                    I had the -- the reason that I was given as to

1  why he didn't pick me was because the guys said they

2  have 90 days to get their Class A CDL.  As I followed up

3  with it he said if they didn't get it, I'd get a call.

4  They didn't get their CDL in 90 days and I still didn't

5  get a call.  As a matter of fact, Ken Ferris -- a year

6  later I couldn't applied for that job again, and you

7  could check those records too, they actually changed how

8  you could get a job in the grounds department at the

9  time.  You could no longer apply like I did.  You had to

10  work in the grounds department for a year before you

11  could even apply for the job at the time.  That's what I

12  heard.

13  **Q.     Okay.  What's the next event?**

14  A.     Give me a second.  I continued not to be

15  supported by supervisors.  I wasn't being supported.

16  **Q.     What does that mean?**

17  A.     Well, when I became -- I might be missing some

18  things but let me start there.  When I became assistant

19  custodian I would have pool workers that come out to

20  building and pool workers wouldn't do their jobs.  Pool

21  workers would come to me -- one of them actually told me

22  while I was trying to get them to work and explain what

23  their work duties should be, come on time, do your job,

24  you don't leave early -- excuse me.  One of them told me

25  that John Beverlin told them -- this is the exact words,

1    excuse my language, but John Beverlin told him that he

2    doesn't fucking work for me.  That's what the guy said.

3    I don't fucking work for you.  John told him to tell me

4    that I don't fucking work for you.  I've been told by

5    John Beverlin that I don't run the building, which I'm

6    sure we'll get into that a little bit later also.  I was

7    allowed to be downgraded by the principal because of

8    that situation.

9    Q.      I'm sorry.  Before you move on I just want to

10   understand what you're saying.  When you say

11   "downgraded," you're referring again to that same job

12   evaluation?

13   A.      Yes.

14   Q.      And that you think was related to events of

15   2002?

16   A.      Absolutely.

17   Q.      And what's your basis for that belief?

18   A.      She wasn't allowed to do it.  There's been other

19   custodians -- if you look at the evaluation -- I

20   evaluate people.  The way that an evaluation works, if

21   you look at the back of the evaluation when you begin to

22   downgrade someone you don't just downgrade them.  It's a

23   six month evaluation.  If a person, if you feel like

24   they're going south, you give them three months, or a

25   mid term evaluation.  You sit down and talk to them and

1  say this is where you're at right now, continue this way

2  and this is where you're going to end up.

3        Another thing too, I can't downgrade anybody not

4  even to a 70 unless there's documentation saying I gave

5  you a verbal warning here, a written warning here.

6  There's paperwork that allows that.  You don't just sit

7  down with a person after six months and say you failed

8  and there's no other conversation about it.

9  Q.      **All right.**

10 A.      Management saw that, management being John

11 Beverlin, Tom Kekela and Matt Frame they seen this

12 paperwork -- let me stop there because you probably got

13 another question.  I think I made the point as far as

14 the evaluation.

15             MR. GILBERT:  If you have other things

16 to answer you can fully respond to the question.

17 A.      Okay.  They allowed this to happen.  I sent an

18 e-mail to John Beverlin after I got that evaluation and

19 I said listen, Mr. Beverlin, she downgraded me.  I've

20 never had a verbal warning, never had a written warning

21 and never knew that this was going to be my score.  I

22 was very surprised that she gave me this score.  When I

23 shared that information with John Beverlin, John

24 Beverlin got in touch with the principal and said you

25 need some paperwork and that's when paperwork started

1  coming from everywhere, him letting her know.

2          John Beverlin wanted this to happen.  He didn't

3  stop it from happening.  He could have easily had the

4  conversation that I had with him with her letting her

5  know on the back of this evaluation this is how this

6  works and this is how it should be done.  Neither

7  Beverlin, Frame or Tom Kekela stepped in to have

8  anything to do with that.  Also, if there was anything

9  that happened at the building -- I can't remember when,

10  but I do know Mike Critchfield was coming out to the

11  building and speaking with a previous principal, you

12  know Mark sued the board, which was trying to get me in

13  trouble.

14  **Q.      I'm sorry.  Say that over again.**

15  A.      Mike Critchfield came out to a previous

16  principal that we had in the building.

17  **Q.      When was this?**

18  A.      This probably was 2013 or 2014.  I think

19  Critchfield was still here at that time I believe.

20  **Q.      Before we talk about Critchfield, can we talk**

21  **about Bruce with the evaluation?**

22  A.      Yes.  Go ahead.

23              MR. GILBERT:  Wait a minute.  He

24  didn't finish his answer, though.  Somebody said you

25  know he sued the board.  Who was that?

1    A.        That was Mike Critchfield and also John Beverlin

2    came out to the same principal at a different time when

3    he became custodial coordinator, he came out to the

4    building and brought that same fact up to the principal,

5    the same principal that Mike Critchfield did.

6    BY MR. McLANDRICH:

7    **Q.        Who is this?**

8    A.        The principal?

9    **Q.        Yeah.  Give me the principal.**

10   A.        John Beverlin and Mike Critchfield approached a

11   previous principal saying you know Mark sued the board.

12   **Q.        Who is this previous principal?**

13   A.        That would be Angela Brooks -- or Angela Harper.

14   I don't know if she's still married.  It's either Angela

15   Harper or Angela Harper-Brooks.

16   **Q.        How do you know that they told Ms. Brooks this,**

17   **or Ms. Harper?**

18   A.        She told me.

19                    MR. GILBERT:  Who told you?

20   A.        Ms. Brooks because she was very surprised that

21   they brought it up.  She had mentioned to them -- it was

22   along the lines -- you'd have to ask her, but it's along

23   the lines of do you know what's going on and she said

24   yeah, I guess -- I can't remember.  I don't want to say

25   anything that might be wrong.  I'll leave it at that,

```
 1   but they did have conversations in the office with

 2   Ms. Brooks about me suing the board.

 3   BY MR. McLANDRICH:

 4   Q.      So what I want to know is, to the best of your

 5   memory, what did Ms. Brooks tell you?

 6   A.      She came to me and said, Mark -- she came to me

 7   and said they brought up your hangman noose situation or

 8   that you sued the board.  I think it was just that you

 9   sued the board.  That's to the best of my recollection.

10   Q.      And then what happened as a result of them

11   telling her that, anything?

12   A.      I think they wanted her to turn against me.

13   Q.      And did she?

14   A.      Oh, no.  She didn't.

15   Q.      Okay.  What else do you believe has happened to

16   you at APS because of the incident in 2002?

17              MR. GILBERT:  Mr. McLandrich, you

18   asked him when that occurred and I don't think he gave

19   you an answer.  Can he respond to that as well?

20              MR. McLANDRICH:  Yeah.

21   BY MR. McLANDRICH:

22   Q.      Tell me when that occurred.

23   A.      With Critchfield, like I said, that was probably

24   2013 or 2014.  I'm thinking maybe 2014.  John Beverlin I

25   believe it was -- it might have been 2015.  I may have
```

Page 39

1   these dates wrong but I think once Critchfield left and

2   John Beverlin stepped in the position that's when he had

3   come out.  I'm doing my best as trying to remember.

4   Q.      That's all you can do.  In any event, Ms. Harper

5   didn't take any adverse action toward you?

6   A.      No.

7   Q.      So what else do you believe happened to you at

8   APS that you trace to the events of 2002?

9   A.      I mentioned not being supported.  Not being

10  supported.

11  Q.      And that's when you were the assistant

12  custodian?

13  A.      And not being a supported as a head custodian.

14  There were many complaints I had.  As a matter of fact,

15  I have some e-mails that John Beverlin really pretty

16  much stop communicating with me.  I got e-mails showing

17  me reaching out to John Beverlin but there's never any

18  response.  I'm pretty sure I've got those e-mails.

19  Q.      When is that that he stopped communicating with

20  you?

21  A.      As head custodian.

22  Q.      When?  What year?

23  A.      That was probably the end of 2016, end of 2017.

24  Somewhere along those lines.  Definitely 2017 it was

25  hard trying to reach him trying to get in touch with

1    him.  There were times that he wouldn't even answer my

2    phone calls.

3    Q.      And what did that result in for you as a head

4    custodian?  What did that cause you to suffer or not get

5    or so forth?

6    A.      Well, being a new head custodian you're not

7    really -- you're pretty much handed keys and said this

8    is your building.  There's still questions and things

9    that you haven't done.  Night custodian is totally

10   different than day custodian.  Even though we fill in

11   sometimes, it's a totally different beast.  So you need

12   help from people who have been custodians before so you

13   reach out to them for advice.  There were times when

14   other things that happened in -- you want me to

15   continue?

16   Q.      Yeah.  Sure.

17   A.      There were things in my building that I couldn't

18   get done like when you put in work permits that I

19   believe had to do with that.  As a matter of fact, there

20   was a guy -- let me stay on track.  There were things

21   that I couldn't get done around my building.

22   Q.      Like what?

23   A.      Well, like trying to get my parking lot

24   resealed.  Getting the parking lot resealed.  There were

25   other buildings there were parking lots were being

1   sealed and Crouse wasn't.  Like I said, I wasn't being

2   supported as a head custodian either.  You know, when I

3   come out and the guy -- I wouldn't call him the

4   ringleader of the hangman noose situation, but when they

5   came in the room he had the noose around the assistant's

6   neck at the time -- his name was Mike Withrough.  When I

7   went to Crouse, at old Crouse, what Mike Critchfield did

8   was sent that guy out to Crouse to work with me and when

9   I seen him come across that building, I almost called

10  the police.  I was wondering why is this man in my

11  building?  Why is he allowed to work with me?  I gave

12  Mike Critchfield a call and said why is this man in my

13  building after everything I went through across town

14  with him?  Mike Critchfield said he can't pick and

15  choose.  I'm trying to remember his exact words but

16  that's pretty much all we got, so we have to send him

17  out there.

18  **Q.      What year is this?**

19  A.      It was when I was at old Crouse, so somewhere

20  between 2003 to 2007 or '08.  And I'm thinking it's more

21  close to 2003 because of the way that things were going.

22  I'm bouncing around a little bit, but what happened to

23  me after another thing that happened, Mike Critchfield

24  -- I had complained about this hangman noose thing for a

25  long time.  It went on for about six months.  I had

Page 42

1   complained to the union.  I complained to the head

2   custodian.  I complained to Mike Critchfield.  I

3   complained to Mr. Parker.  I don't know his first name.

4   I complained to Mr. Parker.  At the end of six months

5   Mr. Parked -- anyway, Mike Critchfield came up to the

6   building unannounced, he comes up and said go to your

7   locker and get your things.  So I don't know what's

8   going on.  I'm thinking I'm fired, I don't know.  And so

9   he tells me to come down to a meeting I think the

10  following week with a Patty Tschantz.  I used to know

11  how to spell that name.  I don't know her position.  She

12  may have had the same position that Debra Foulk has now,

13  possibly.

14          Anyway, Mike Critchfield takes me out of the

15  building but before he kind of walks me around the

16  building he kind of walks me around to gather up all of

17  my things but he was following behind me, but he was

18  following behind me with the assistant custodian, the

19  same guy that came in the room with the noose around his

20  neck.  That sent a powerful message out to me saying

21  these guys are putting me out the building, not only is

22  he putting me out of the building, he's putting me out

23  of the building with the guy who I call the ringleader

24  of it because he was the assistant custodian at the

25  time.

1          So when I go to the meeting with Patty Tschantz,

2     what they do -- this is another thing because of the '02

3     situation.  I don't know if you know where Goodyear

4     Middle School is compared to East High School, but you

5     could look out the window at East High School and see

6     Goodyear Middle School.  What they decided to do is take

7     me out of Goodyear Middle School, which I didn't want to

8     leave.  I'd rather those guys transfer, because I knew

9     my enemies there, but what happened is they sent me to

10    East to where the ringleader of the hangman noose

11    situation at Goodyear Middle School, his father worked

12    at East High School and he was the head custodian.  I

13    told them at the meeting with Mike Critchfield --

14                    MR. GILBERT:  You okay?  Let's take a

15    break.

16    A.    I think I can keep going.  Sometimes this

17    happens.  Let me try to get through this.

18                    MR. GILBERT:  Do you remember the

19    question that you're responding to?

20    A.       Yes.  I told Patty Tschantz and Mr. Critchfield

21    that I was afraid.

22                    MR. GILBERT:  Why don't we go ahead

23    and take a break.  Counsel, can we take a ten minute

24    break?

25                    MR. McLANDRICH:  As long as

Page 44

1    Mr. Garnett needs we'll take.

2              MR. GILBERT:  I know you're in the

3    middle of an answer, a very long answer.  We'll come

4    back and pick up on that.  Are you okay?  Do you want to

5    finish that answer and then take a break?

6    A.    I'd like to try again.

7              MR. GILBERT:  You want to do it now or

8    a little later?

9    A.    Would it be okay if I try again?  If I don't

10   make it through it then maybe I'll take a break.

11             MR. GILBERT:  Is that okay, John, if

12   he continues on and tries to answer this question fully?

13             MR. McLANDRICH:  That's fine.  I'll

14   refer to Mr. Garnett.

15   A.    Okay.  I told Mr. Critchfield and Patty Tschantz

16   that I was afraid to go to that building.  I told them

17   that I was very uncomfortable so I went to that building

18   with a lot of fear.  I told them, why are you sending me

19   to a building where this guy's father worked or

20   stepfather?  They told me that I shouldn't have any

21   problems, but still I was uncomfortable with that.  Not

22   only was the head custodian his step dad, I still had

23   other ties at Goodyear Middle School where the head

24   custodian didn't do anything about what was happening to

25   me.  He was a football coach at East.

1       So at that time I was very paranoid and I didn't
2   understand why they was sending me right up the street.
3   I would have went anywhere.  When I got the opportunity
4   that's when I ended up at Crouse because it was clear
5   across town and no custodians wanted to work at Crouse.
6   Crouse always had a bad reputation as far as the area,
7   cars broken into, gun shots and different things like
8   that.  And like I said, moving up to -- you know, never
9   being -- like I said, it was Ken Ferris and I think
10  after Ken Ferris Mike Critchfield took his job and
11  became the custodial coordinator.  And you know the
12  history of Mike walking me around with the ringleader of
13  the hangman noose, so he became custodian coordinator
14  and then after that John Beverlin.

15      Like I said, not only did they send Mike
16  Withrough who had the noose in my face and chased me
17  down the hall with the noose, not only did they bring
18  him out to old Crouse, when the new Crouse was built he
19  ended up showing up out there and I believe that John
20  Beverlin sent him that time.  Mike Critchfield sent him
21  the first time and John Beverlin sent him the second
22  time.

23              MR. GILBERT:  Okay.  Let's take a ten
24  minute break then.

25                      - - - -

1     (Thereupon, an off-the-record discussion was held.)

2                    - - - -

3    BY MR. McLANDRICH:

4    **Q.      So when we took the break, Mr. Garnett, you were**

5    **cataloging what you believe happened at APS because of**

6    **the events in 2002.  When we stopped you were talking**

7    **about your transfer to East.  Is there anything else you**

8    **want to discuss before we talk about the next item?**

9    A.      The transfer to East.  That's how I ended up at

10   Crouse.  I bid on Crouse school and nobody really wanted

11   to work at Crouse so I took that school to go as far

12   away as I can.  I mentioned that with Mike Withrough

13   they allowed him to come out to the building at old

14   Crouse and at the new Crouse with me.

15          Also, bringing it more up to date with not being

16   supported by John Beverlin, Tom Kekela, Matt Frame or

17   Mike Critchfield as an assistant or head custodian.  One

18   example, I would get the worst pool workers.  We do have

19   good pool workers that work for the board but I was

20   never given those kind of pool workers.  I always had

21   the pool workers that were untrained and more mental

22   issues than others.  I was given aggressive people.

23   They allowed them to verbally assault me, not do their

24   work and not discipline them and all these things I feel

25   is stemmed from the '02 situation, these guys just not

1  liking me because of that.

2  **Q.      All right.  When you were at East -- was is it**

3  **Withrough, the fellow that was transferred to East and**

4  **then Crouse?**

5  A.      No.  That was me transferred to East.

6  **Q.      I'm sorry.**

7  A.      They transferred me to East with the guy that

8  was the ringleader of the hangman noose situation named

9  Ryan Webster and his stepfather was at the head

10  custodian at East, and that's where they decided to

11  transfer me was to East High School.

12  **Q.      Did that stepfather abuse you in any fashion?**

13  A.      Well, I don't know what their plans were but

14  when I brought up the fact -- they didn't know that I

15  knew it was his stepfather, but I brought that up to

16  Patty Tschantz and Mike Critchfield in that meeting.

17  Once I brought that up and let know that I was, first of

18  all afraid to go there, and that I knew it was Ryan

19  Webster's stepfather, I didn't know if they had plans to

20  continue with the harassment or whatever, but to answer

21  your question nothing happened there.  Although nothing

22  happened, it didn't help my paranoia at all.

23  **Q.      I understand that, I just want to know if**

24  **anything happened, though.**

25  A.      No.

Page 48

1   Q.      Who was the fellow that went with you to old

2   Crouse and new Crouse?

3   A.      Mike Withrough I believe.

4   Q.      And did he do anything improper towards you at

5   old Crouse or new Crouse when that transfer happened?

6   A.      No.  When he came the first time I was just an

7   eight-hour custodial worker.  It terrified me to see him

8   walking through the building because I didn't know why

9   he was there.  The second time he came I was an

10  assistant custodian and when he came to my building as

11  an assistant custodian I was still uncomfortable but I

12  treated him with nothing but respect.  He was still an

13  eight-hour custodial worker at the time, but still I was

14  uncomfortable.

15  Q.      So you would have been above him at that point?

16  A.      I would have been his supervisor.

17  Q.      All right.  And when you say "old Crouse,"

18  you're talking about a separate physical building?  In

19  other words an older building?

20  A.      Yeah.  Right next to where the new Crouse is

21  now.

22  Q.      And they built a new building and tore down the

23  old one?

24  A.      Yes.

25  Q.      Okay.  Are there other events that happened you

1  at APS that you attribute to the event from 2002?

2  A.     Yes.  I did mention the evaluation, correct?

3  Q.     Yes.

4  A.     Okay.  There's probably other things that will

5  come to me that I can't think of right now.

6  Q.     If you think of them, we'll come back to them.

7  A.     Okay.  They also told me that because of the

8  evaluation I couldn't bid on buildings.

9  Q.     You mentioned that.

10  A.     Okay.  That was Matt Frame who came and told me

11  that.

12  Q.     We already talked about once you got that

13  evaluation you were already on leave?

14  A.     Right.  Right.  Which the evaluation had to be

15  corrected.  When I got that downgrade I saw so many

16  buildings, high schools, junior high schools just

17  passing me by.  I thought that was part of the whole

18  thing with the bad evaluation.  I can't bid on a

19  building and I can't advance.  Like that was all part of

20  their plan.

21  Q.     I want to go back and ask you some follow-up

22  questions.  How is it that you believe that the poor

23  evaluation that you received from Ms. Bruce was due to

24  the events of 2002?  What makes that connection in your

25  mind?

1    A.       She knew about the hangman noose also.  As a

2    matter of fact, she came back to my office and she sat

3    down and was wondering about some permits around the

4    building to get some different work done.  I explained

5    to her that we're usually the last building to be taken

6    care of and, you know, she wanted to know why that was.

7    We ended up having a conversation about the '02

8    incident.  She didn't seem too pleased with me saying

9    that I sued the board, or took them to court.  I

10   expected a different response but her body language and

11   how she looked at me, she was upset about that.

12   **Q.       Let me just understand this.  So she came to**

13   **your office area and asked you about permits which would**

14   **be requests to have work done at the school, right?**

15   A.       Yes.

16   **Q.       All right.  And then you told her that Crouse is**

17   **always the last one to get work done and you told her**

18   **that believe that the reason that Crouse being the last**

19   **one to have work done is because of the events of 2002**

20   **and because you sued the district?**

21   A.       Right.  That's why I wasn't getting supported.

22   **Q.       And then based on her reaction to that you felt**

23   **that she should have been more supportive of your**

24   **position because of the 2002 incident?**

25   A.       Say that again.

Page 51

1   Q.      Sure.  Her reaction to you telling her that you

2   thought she would be more supportive of you but she

3   somehow seemed put off.  Is that what I'm getting?

4   A.      Yes.  Yes.

5   Q.      And is it possible that she was put off by the

6   fact that you believe Crouse isn't getting its permits

7   done because of the 2002 incident?  In other words, she

8   doesn't agree that 18 or 15, 16 years later that that's

9   why permits aren't being permitted at Crouse?

10              MR. GILBERT:  Objection.  Go ahead and

11  answer if you know.

12  A.      It wasn't just with that.  As time went on when

13  she began to speak to the supervisor she actually used

14  that '02 situation against me by talking with John

15  Beverlin and somehow coming together to set me up, used

16  that '02, because I told her everything.  What I mean is

17  that I told her about how John Beverlin felt about me,

18  Tom Kekela felt about me and Matt Frame, but yet she

19  became their friends.  It was like she was always

20  reaching out to them especially in 2017, that she was

21  using everything that I told her against me is how I

22  felt.

23  BY MR. McLANDRICH:

24  Q.      So I take it that you told her that you're

25  belief was, you know, Beverlin doesn't like me, Kekela

1  doesn't like me, Frame doesn't like me.  Is that what

2  you're saying?  Is that what you told her?

3  A.      I pretty much told her strongly about Beverlin

4  and Kekela.

5  Q.      Okay.  And what was it that you told her is, I

6  guess, what I'm trying to find out?

7  A.      I told her that they were upset with me about

8  the '02 incident.

9  Q.      And how do you know that Beverlin and Kekela

10  were upset about 2002 incident?

11  A.      We've had conversations about it.  Beverlin sat

12  in my office -- even in 2016, he came out to my building

13  to tell me I didn't run the building, that it wasn't my

14  building.  I was wondering from that comment that he

15  made, who runs the building?  I'm the one cutting the

16  grass and cleaning the outside and inside, but that

17  hangman noose situation came up in the office.

18  Q.      And how did it come up?

19  A.      I can't remember how it came up.

20  Q.      Did you bring it up or did he?

21  A.      I can't remember how it came up but I know that

22  John Beverlin wasn't happy.  It might have come up

23  through conversations about Critchfield which was his

24  previous boss.  You know, maybe I brought it up.  Maybe

25  I had mentioned Critchfield coming out to the building

1  saying something to a principal.  I'm trying to remember

2  the best I can.  Maybe I mentioned something about

3  Critchfield coming out to the building and about the

4  hangman noose situation.  I just remember clearly John

5  Beverlin looking at me with an angry face and I knew

6  about that.

7  **Q.    So it's not what he said, it's how he looked?**

8  A.    It's what he said too, I know about that.

9  **Q.    That's what he said when you brought it up, I**

10  **know about that?**

11  A.    Well, I don't know if he'd been out to talk to

12  the principal at that time.  I can't remember.  The

13  timing as far as that is kind off with me right now as

14  far as when he came to the principal and did the same

15  thing that Mike Critchfield did.

16        MR. GILBERT:  I'm going to object to

17  the question because the witness has said he doesn't

18  know who brought it up at that meeting.  He said about

19  Mr. Frame bringing it up at another time as well.

20        MR. McLANDRICH:  Those are improper

21  objections, Ed, and I'd appreciate you not testifying on

22  the record.

23        MR. GILBERT:  That was your question.

24  I'm objecting to the form of the question.

25  BY MR. McLANDRICH:

Page 54

1   Q.      So when Mr. Beverlin said you don't run the

2   building, the principal runs the building, don't they?

3   A.      The principal -- I forget how they stated it.

4   Q.      Well, when you had the meeting that you recorded

5   and you produced that recording to me where you met with

6   Ms. Bruce and I think Mr. Frame again, and Ms. Hines

7   there was this discussion about who runs the building at

8   that time and the principal runs the building, right?

9   A.      He said run the building, we weren't speaking

10  about running the building.  We were speaking about

11  running the custodial crew.  That's what I was talking

12  about.  I was talking about pool workers, when the pool

13  workers are supposed to work and different things like

14  that.  It wasn't the building.  Of course I don't run

15  the building, but we were talking about something else.

16  We were talking about custodial staff.

17  Q.      And as far as the custodial staff goes, as head

18  custodian if you wanted to change the schedule or change

19  who works at the building you have to go through your

20  superiors to get those changed, correct?  You can't

21  unilaterally change people's work hours, correct?

22  A.      No.  I can't change their work hours and I tried

23  that.

24  Q.      And so you have to go through your superiors if

25  you want to change work hours?

Page 55

1    A.       Right.

2    Q.       **Now you've talked several times about not having**

3    **enough support at Crouse, right?**

4    A.       Right.

5    Q.       **And by that you meant -- well, you tell me, but**

6    **did that include not having enough staffing?  Is that**

7    **what you mean by that?**

8    A.       Ask that question again.

9    Q.       **Sure.  When you say that you don't have enough**

10   **support at Crouse, is that an allegation that you didn't**

11   **have enough workers?**

12   A.       It wasn't that I didn't have enough workers, it

13   was the workers that they were sending and the hours

14   that they would bring them in.  I'm the head custodian.

15   You can't bring me two -- you can place two five-hour

16   people with an eight-hour worker but then you bring them

17   in 2:30 to 7:30, or even if you brought in two six-hour

18   people 2:30 to 8:30, that doesn't work for the building.

19   It doesn't work when I have permits that last some time

20   between 9 and 9:30 and the building still needs somebody

21   to maintain it.

22           If I make a suggestion to say, hey, I need to

23   stagger these people, one in 2:30 to this and then

24   another one 4:30 to 10:30, that fell on deaf ears.  My

25   building still can't get clean.  It's not having more

1   people work more hours, it's staggering them and then

2   it's also having people that are trained in the

3   building.  It was often I had people that weren't

4   trained and also people that weren't compliant.  I had

5   people sneaking, doing other things beside working.

6                  MR. GILBERT:  Mr. McLandrich, you

7   asked a question earlier on several questions ago and

8   Mr. Garnett has not been able to fully respond to that.

9   I'm going to ask you to ask that question again.

10                  MR. McLANDRICH:  I'm not sure what

11  you're talking about, Ed.

12                  MR. GILBERT:  Excuse me.  You talked

13  about Mr. Beverlin and he also raised Mr. Frame in

14  regards to the 2002 incident bringing that up to date

15  and what Mr. Frame had said.  He covered Beverlin, but

16  you didn't allow him to finish Mr. Frame.

17                  MR. McLANDRICH:  I never stopped him

18  from saying anything, Ed.

19                  MR. GILBERT:  He mentioned the two of

20  them, but you never went back to that to allow him to

21  finish his answer.  That's all I'm saying.

22                  MR. McLANDRICH:  I appreciate your

23  help with my deposition, Ed.  Thank you.

24  A.     May I finish?

25                  MR. GILBERT:  You're allowed to finish

1   your answer if you have more.

2                       MR. McLANDRICH:  I'll ask you the

3   question when I want to you answer it.

4                       MR. GILBERT:  I'll just note on the

5   record that you didn't allow him to finish.

6                       MR. McLANDRICH:  Put whatever you want

7   on the record, Ed.  You're doing a fine job of that.

8   A.      Okay.  I'll wait.  The last thing I said I was

9   talking about pool workers doing other things that they

10  weren't supposed to be doing.

11  BY MR. McLANDRICH:

12  **Q.      You said you talked to -- let's address Ed's**

13  **issue and get it off the table here.  You said that you**

14  **talked to Mr. Frame about the 2002 incident.  Tell me**

15  **about that.**

16  A.      Mr. Frame talked about that incident many times.

17  We shared a lot of things.  His PTSD my PTSD.  We shared

18  a lot of things about the '02 incident.

19  **Q.      So you would bring the 2002 incident up to him**

20  **as part of those discussions?**

21                      MR. GILBERT:  Objection.

22  A.      I don't know how we were personally talking.  I

23  think he said that he heard about it.

24  BY MR. McLANDRICH:

25  **Q.      Okay.  And just out of the blue he offered that**

1   he heard about it?

2   A.      We were personally talking.  He was telling me

3   that he had PTSD, that he was in the service, jumped off

4   the back of humvee, hurt his back and things like that.

5   General conversation.

6   Q.      So it was in the context of discussing the fact

7   that you both had PTSD and you brought up the issue of

8   the 2002 incident as one of the sources of your PTSD.

9   Is that what you're telling me?

10  A.      I believe I understand that question.  I think

11  the answer is yes.

12  Q.      All right.  Let's go to Exhibit K if we could,

13  please.  Mr. Garnett, pull up Exhibit K.

14  A.      Okay.

15                      - - - -

16      (Thereupon, Defendants' Exhibit K was marked for

17                  identification.)

18                      - - - -

19                  MR. GILBERT:  Can you see it,

20  Mr. Garnett?

21  A.      My wife left and let me see if my daughter -- it

22  needs a swipe thing to get back in it.  Yes.  I see it.

23  BY MR. McLANDRICH:

24  Q.      So the first page of Exhibit K is an e-mail from

25  you to Debra Foulk dated March 30th, 2017.  Do you see

1    that?

2    A.      Yes.

3    Q.      And you're requesting to have a meeting with her

4    because there's some things that you'd like to talk to

5    her about.

6    A.      Yes.

7    Q.      Okay.  Does this include the pool workers and

8    staffing at the building?

9    A.      That's possible.

10   Q.      All right.

11   A.      I know it had to do with Beverlin, possibly Matt

12   Frame.

13   Q.      And by that do you mean issues that you were

14   having with them and that you were unhappy somehow?

15   A.      Yes.

16   Q.      If you turn back, the seventh page should be an

17   e-mail from you to Debra Foulk dated April 24th, 2017.

18   Do you see that?

19   A.      I see April the 21st.  Did I go too far?

20   Q.      This is an April 24th e-mail.

21   A.      Okay.  I'm going in the right direction.  I'm on

22   it.

23   Q.      Okay.  And it starts with "Here are the work

24   schedules that you asked for," right?

25   A.      Yes.

1    Q.      And it continues on, and maybe I'll just read it

2    into the record so we can discuss it.  "All the things

3    that I do are not written in my schedule because it

4    would take another page.  If I could get the pool

5    worker, Thomas, to work 4:30 to 10:30 Monday through

6    Thursday, and 4:30 to 9:30 on Friday I think that would

7    be much better.  I can get the other Mikal," M-I-K-A-L,

8    "to start on time, he's a lot more focussed and does

9    what I ask him to do (he's a team player.)  I stopped

10   working the overtime because I couldn't get Thomas to

11   stay focussed.  I would like to work the two hours over

12   that they were giving me, and that I believe me and

13   Mikal can get most of the first floor done.  Thomas can

14   help Donnelle," D-O-N-N-E-L-L-E, "like you said and

15   finish up with main office complex on first floor at the

16   end of the night, but I think he should start with

17   helping Ms. Donnelle first thing because he will be

18   distracted starting on the floor.  I will not be back to

19   work until Wednesday, and I don't think filters were

20   changed while I was off so if you would let me work the

21   two hour overtime again, I think we'll be fine the rest

22   of the year.  Let me know what you decide.  I feel

23   better talking with you.  PS, Thomas could also help

24   with the evening permits."

25   A.      Yes.

Page 61

1   Q.      And then at the bottom is an attachments, work

2   schedules PDF, which is the next few pages in the

3   exhibit, the next three pages.

4   A.      Okay.

5   Q.      And so, my question is this e-mail addresses a

6   number of the things that you've been talking about.

7   The schedules of the pool workers, the assignments of

8   the pool worker, and how their work is going to be

9   oriented, correct?

10  A.      Yes.

11  Q.      And then as a result of that meeting if you go

12  past those schedules that are attached she writes you

13  back later that same day.  If you find it, it's a March

14  24th e-mail at 2:36.  Do you see that?

15  A.      I see April 24th.

16  Q.      I'm sorry.  April 24th.  Yes.  It says, "Mark,

17  I've received your information.  I'll be reviewing then

18  discussing with others upon their return to the

19  district.  Thank you for sitting and talking with me

20  last Friday, Debra."  Correct?

21  A.      Yes.

22  Q.      And then the next page is your response to her

23  dated May 11, 2017.  It says, "I just want to say hi --

24  A.      Let me make sure I know where you are.

25  Q.      Sure.  The next page, May 11, 2017.

Page 62

1    A.       Okay.

2    Q.       Mark Garnett to Debra Foulk.  "I just want to

3    say hi.  Things have gotten much better and I feel so

4    much better.  Thanks for listening and hearing.  You

5    made a difference," and then there's an Emoji next to

6    that, right?

7    A.       Yes.

8    Q.       And so the way that I read this, and correct me

9    if I get it wrong, it sounds like she addressed your

10   concerns and whatever changes she made you think things

11   were much better?

12   A.       The reason that I wrote that e-mail from my

13   memory after meeting with her Mr. Beverlin came out to

14   the building, stopped me in the cafeteria and he told me

15   that he was going to bring me a new zero-turn because up

16   until that time I just had a walk behind.  Since that

17   happened after the meeting with Debra Foulk and now

18   we're talking about the zero-turn that made me feel

19   pretty good.  I thought that had stemmed from the

20   meeting that I had with Debra Foulk, but I found out

21   later that things really didn't get better, they got

22   worse after speaking with Debra Foulk.

23   Q.       Okay.  And we'll get to that in a minute but if

24   you turn then to the next page, the next e-mail dated

25   May 11th, 2017, from Debra Foulk back to you, it says,

Page 63

1    "Mark, nice to hear from you.  Yes I worked on a plan

2    with John and Rob to see what alterations/support that

3    could be provided.  Please take full advantage of the

4    plan put into place to support your learning and improve

5    the operation of your building.  Thanks for reaching out

6    to me, Debra," right?

7    A.      Yes.

8    Q.      Obviously, from the e-mail anyway, there were

9    some changes to alter the support that you were

10   receiving, correct?

11                  MR. GILBERT:  Counsel, you misread

12   that one.  It says "your learning and improve the

13   operations of your building."

14                  MR. McLANDRICH:  That's what I read.

15                  MR. GILBERT:  Okay.

16   BY MR. McLANDRICH:

17   Q.      I'll read it again to make sure there's no

18   confusion.

19   A.      Okay.

20   Q.      The last sentence says "please take full

21   advantage of the plan put in place to support your

22   learning and improve the operation of your building."

23   It says you, but meant your, right?

24   A.      Right.

25   Q.      And so this e-mail suggests that there was a

1  **plan put in place to alter the support that you'd been**

2  **provided up until then, right?**

3  A.    A plan for what?

4  **Q.    It doesn't say specifically.  It says,**

5  **"alterations/support."  It doesn't say anything about a**

6  **zero-turn.**

7  A.    Right.  Well, she told me in the meeting because

8  we also talked about the '02 incident, and she seemed to

9  be upset about that from what I remember in the meeting.

10  **Q.    Okay.  Was there any change in the support that**

11  **was provided to you?  You're saying there was no change?**

12  A.    What I'm saying is that I found out later that

13  these were just words.  You can read this e-mail and say

14  that sounds nice and it sounds like there was a plan,

15  but what actually was the plan because she was upset in

16  the meeting about finding out that I sued the board.

17  **Q.    All right.  So when you say "things have gotten**

18  **much better," you weren't being truthful in other words?**

19  A.    No.  It wasn't that I wasn't being truthful.  It

20  was the fact that I was getting the zero-turn and I

21  thought that the meeting that I had with her turned John

22  Beverlin around.  The only thing that I ever wanted was

23  for me to work with people and people to work with me.

24  If that's what was happening, that's what I thought what

25  happening.

1  Q.      Is it your testimony that when you wrote the

2  e-mail that says, "things have gotten so much better,"

3  that that was a reference to the zero-turn?

4  A.      That was a reference to how I felt.

5  Q.      It's not saying -- your next phrase in that is

6  "I feel so much better," so that's the reference to how

7  you felt, right?

8  A.      Exactly.

9  Q.      But the phrase before that, "things have gotten

10  much better," that's obviously not referring to how you

11  felt, right?

12  A.      The only thing that I can tell you is why I

13  wrote this letter.  When John Beverlin came out, me and

14  him had a conversation after talking about Debra Foulk,

15  we had a conversation in the cafeteria as if I was his

16  best friend all of a sudden, and we spoke of a

17  zero-turn.  That's what started me to write this e-mail.

18  Q.      This meeting in the cafeteria, is that one of

19  your other recorded meetings?

20  A.      No.  That one wasn't recorded.

21  Q.      One of your records you have labeled as making

22  some reference to comments about a black man.  Do you

23  recall that?

24  A.      Yes.

25  Q.      And I've listened to that recording and I

Page 66

1  presume you have as well, correct?

2  A.     Yes.

3  Q.     I didn't hear any reference to a black man in

4  that recording.  Can you tell me where I could find

5  that?

6  A.     She made references to black men all the time.

7  Q.     I'm talking about that recording that you

8  labeled to have a comment about black men.  I don't hear

9  any comment in there.  I'm wondering if you could point

10  me to it.

11                   MR. GILBERT:  Objection.  Who are we

12  talking about?  You said "she."  Bruce?

13                   MR. McLANDRICH:  Yes.

14  BY MR. McLANDRICH:

15  Q.     It's a recording of yourself and Ms. Bruce

16  talking, correct?

17  A.     Yes.

18  Q.     All right.  In the recording of you and Ms.

19  Bruce talking -- again, I've listened to the whole

20  thing.  I don't hear any negative references about black

21  men and I'm wondering if you could point me to any

22  statements in that recording where she makes negative

23  comments about black men or preferring white custodians,

24  or not wanting a back custodian or anything like that?

25                   MR. GILBERT:  Objection.  When you say

1    "negative," I don't know what that means.  I object.

2                    MR. McLANDRICH:  Ed, I appreciate that

3    and, you know, if the witness doesn't understand what

4    negative means then he can tell me, otherwise we'll

5    proceed with the deposition.

6    A.      Again, my testimony is that she's made these

7    comments over and over.  In this tape if you listen she

8    says "what the black men don't do," and I'm trying to

9    remember.  She said "the black men come in there and do

10   half shit."

11   BY MR. McLANDRICH:

12   **Q.      That's on that recording, that's your testimony?**

13   A.      I think that's on the recording.

14   **Q.      All right.  When did you start making**

15   **recordings?**

16   A.      I don't remember.  Probably, I think -- I can't

17   remember.

18   **Q.      Why did you start making recordings?**

19   A.      Because the things that the principal would say.

20   A lot of things I didn't get on tape, you know, but I

21   thought it might be a good idea to start recording some

22   of the things that she was saying.

23   **Q.      The only thing that I heard on that tape that**

24   **was significant as far as these allegations go, she said**

25   **that you were slow.  Do you recall hearing that on that**

1   tape?

2   A.      Yes.

3               MR. GILBERT:  Object to the question.

4   You can answer the question, but if you don't agree with

5   that editorial, then don't agree with the editorial.

6   BY MR. McLANDRICH:

7   Q.      That's fine.  I'll ask it over.  I heard her say

8   on that tape that you were slow.  Do you recall hearing

9   that you move slow at times?

10  A.      Yes.

11  Q.      All right.  Now she doesn't say -- correct me if

12  I'm wrong, she doesn't say on that tape that you move

13  slow because you're a black man or anything like that,

14  right?

15  A.      No.

16              MR. GILBERT:  You're saying that was

17  not on the tape.  Is that your question?

18  BY MR. McLANDRICH:

19  Q.      My question is does he agree with me that on the

20  tape she says he moves slow, but doesn't attribute

21  moving slow to being a black man, is that correct?

22  A.      Well I contributed that it was negative because

23  of previous things that she would say.

24  Q.      And I appreciate that and we can talk about

25  other things, but if you answer the actual question I

Page 69

1   ask it's much more productive.  I'm asking about the

2   tape now.  We can talk about other conversations and we

3   will.  I'm asking about on that tape she doesn't say you

4   move slow because you're a black man, right?

5   A.    I feel that's what she meant.

6   Q.    I understand what you might have felt.  My

7   question is what she said.

8   A.    Okay.

9              MR. GILBERT:  Objection.  Being

10  argumentive.  If you can recall, Mr. Garnett, go ahead

11  and answer the question.

12  A.    I don't know.

13  BY MR. McLANDRICH:

14  Q.    The tape will speak for itself, obviously, but

15  you don't recall her saying it's because you were a

16  black man, right?

17              MR. GILBERT:  On the tape, you're

18  saying?

19              MR. McLANDRICH:  On the tape.

20  A.    Oh, okay.  No.

21  BY MR. McLANDRICH:

22  Q.    In the complaint you allege that Ms. Bruce said

23  that she preferred Caucasian custodians?

24  A.    Yes.

25  Q.    When did she say that?

Page 70

1    A.        She had started that in 2016.

2                    MR. GILBERT:  I didn't hear that.

3    What was the answer again?

4    A.        She started referencing things like that in

5    2016, end of 2016.

6    BY MR. McLANDRICH:

7    Q.        **So very early on during the time that she was at**

8    **the building, right?**

9    A.        Yes.

10   Q.        **How did that come up?  Did she say that out of**

11   **the blue?**

12   A.        She wanted me to do her work.  She wanted me to

13   do some work that she was supposed to do and I explained

14   to her that I had enough stuff on my plate as far as

15   what I was doing.  Once I get my job down, then maybe I

16   would look into that but she spoke about another

17   custodian that she worked with that did a lot of her

18   work that she was supposed to do.  She said it was a

19   better experience working with him.

20   Q.        **Did this have to do with the fire drill test or**

21   **something like that?**

22   A.        That was part of it.

23   Q.        **What else was it?**

24   A.        She also said that he hung up her bulletin

25   boards.  That fire test was a thing that he used to do.

1    Q.       **What else did that other fellow do that you**

2    **didn't do?**

3    A.       Put pictures and letters up on boards out in the

4    hallway.  She told me that he pretty much acted like he

5    ran the building.

6    Q.       **Were there other things that this person did**

7    **that you weren't doing?**

8    A.       I'm pretty sure there was, but you were talking

9    about her work.

10   Q.       **I understand.  Perhaps a bad question.  What**

11   **other parts of her work was this other custodian doing**

12   **that she wanted you to do that you weren't doing?**

13   A.       Like I said, I already mentioned the fire drill,

14   paperwork and the bulletin boards that people would see

15   coming through the building and things like that.

16   Q.       **Is there anything else that we're missing there?**

17   A.       I'm sure there is, but that's as far as I know.

18   Q.       **She mentioned this other custodian used to do**

19   **these things and then did she said, well, he did these**

20   **things because he was white and you don't do them**

21   **because your black?**

22   A.       She said that she preferred white custodians.

23   Q.       **That's to the best of your recollection --**

24            MR. GILBERT:  Let him finish, please.

25   A.       You're talking about in the beginning of the

1    school year and I'm saying this stuff didn't just come

2    out all of a sudden right then and there.  I'm saying

3    that stuff led up to what she was saying.  It led up to

4    preferring white custodians.

5    BY MR. McLANDRICH:

6    **Q.      Well, that's fine.  I appreciate that.  Let's go**

7    **back to when this started.  You said it was early 2016**

8    **where she was talking about this other custodian that**

9    **used to do things for her, right?**

10   A.      Yes.

11   **Q.      During that conversation did she say anything to**

12   **the effect of I prefer white custodians?**

13   A.      As far as what I remember, how do I know that

14   the custodian was white?  So it was brought up.  I

15   didn't know who she worked with when she came to the

16   building.

17   **Q.      My question is very simple.  Did she say I**

18   **prefer white custodians or words to that effect?**

19   A.      She did stay that she preferred white

20   custodians.

21   **Q.      At that time?**

22   A.      No.  Not at that time.

23   **Q.      That's what I'm asking about.  I'm asking about**

24   **that conversation in early 2016 did she say during that**

25   **conversation I prefer white custodians?**

1  A.      No.  She probably mentioned that he was white

2  but other than that, no.  She didn't say that at that

3  time.

4  **Q.      Did she say he was white?**

5  A.      That's what I was led to believe.

6  **Q.      Did she said he was white?**

7                      MR. GILBERT:  When counsel?  He said

8  she said that in late 2016?  You're asking about --

9                      MR. McLANDRICH:  I'm asking about

10  early 2016.  I'm asking about that first conversation

11  still, so let him just answer the question.

12                      MR. GILBERT:  In early 2016.

13                      MR. McLANDRICH:  In early 2016, I'm

14  still on that first conversation.  Did she say that the

15  other custodian was white?

16                      MR. GILBERT:  He's already

17  testified that the comment --

18                      MR. McLANDRICH:  Don't interrupting

19  this deposition.  I'm going to call the court if you

20  keep this up.

21                      MR. GILBERT:  You're confusing the

22  witness.  You're talking about the first conversation in

23  2016, correct?

24                      MR. McLANDRICH:  We've been on this

25  first conversation the entire time.  It's the only

1    conversation that I'm asking him about.

2    BY MR. McLANDRICH:

3    Q.      **In this first conversation in early 2016 when**

4    **she's talking about this other custodian, did she say**

5    **this other custodian was white?**

6    A.      I don't know how I knew he was white.  She would

7    have had to have mentioned it.  If he's white she would

8    have had to have mentioned it.

9    Q.      **So do you recall her saying -- do you have a**

10   **memory, a specific memory of her saying this other**

11   **custodian was white?**

12   A.      Like I said, I don't know how I knew he was

13   white, but the only reason I would have known he was

14   white -- my understanding if he is white, that's where I

15   got it from.  I never talked to anyone else about her

16   custodian where she came from.

17   Q.      **All right.  I appreciate that, but my question**

18   **is very simple.  Do you have a specific memory of**

19   **Ms. Bruce in early 2016 in this first conversation**

20   **saying that the other custodian was white?**

21   A.      No.  I can't think of it off the top of my head,

22   no.

23   Q.      **Do you have a specific memory of knowing during**

24   **that conversation in 2016 whether that other custodian**

25   **was, in fact, white?**

1                    MR. GILBERT:  Objection.  Counsel, are

2    you talking about early 2016 or late 2016?

3                    MR. McLANDRICH:  If you listen to the

4    question, and I'll repeat it.

5    BY MR. McLANDRICH:

6    **Q.      In that conversation in early 2016 did you, in**

7    **fact, know that other custodian was white?**

8                    MR. GILBERT:  Objection.  Asked and

9    answered.

10                    MR. McLANDRICH:  That's not a proper

11   objection.

12   BY MR. McLANDRICH:

13   **Q.      Did you know the other custodian was white in**

14   **that first conversation in early 2016?**

15   A.      If you're asking for me to say specifically, I

16   can't remember.

17   **Q.      When was the first time that you could**

18   **specifically remember Ms. Bruce saying I prefer white**

19   **custodians or words to that effect?**

20   A.      It would have probably been the end of 2016.

21   **Q.      And as best you can recall what were the**

22   **specific words she used?**

23   A.      We might have been in the cafeteria sweeping up

24   and it was right after -- you know she always made

25   reference to me being slow and working circles around me

Page 76

1    and it was during a time when she was actually walking

2    away, where I could hear her says she preferred white

3    custodians.

4    **Q.      Is that what you recall her saying, I prefer**

5    **white custodians?**

6    A.      As she was walking away as she normally do.

7    **Q.      What other occasions did she say that?**

8    A.      She said her experience with Matt -- there was a

9    guy who filled in for me and the first time that he

10   filled in she wanted him to be the head custodian of the

11   building.

12   **Q.      And who is this?**

13   A.      I think his last name is Bueser maybe.  Matt

14   Bueser.  That's who she continuously compared me to.

15   **Q.      What did she say about Matt Bueser?**

16   A.      That he does the job faster, better.

17   **Q.      What else did she say about Matt Bueser?**

18   A.      About him being younger.

19   **Q.      Anything else she said about Matt Bueser?**

20   A.      I can't think of it right now, but there's

21   probably other things.

22   **Q.      All right.  And is Matt Bueser white?**

23   A.      Yes.

24   **Q.      And from that did you infer that she preferred**

25   **him because he was white?**

Page 77

1                    MR. GILBERT:  Objection.  Asked and

2      answered and he already said that.

3                    MR. McLANDRICH:  Ed, stop it.

4                    MR. GILBERT:  Don't tell me to stop

5      nothing.  I'm raising objections that are asked and

6      answered.

7                    MR. McLANDRICH:  I heard your

8      objection.

9      BY MR. McLANDRICH:

10     **Q.      From that did you infer that she preferred**

11     **Bueser because he was white?**

12                    MR. GILBERT:  Same objection.  Go

13     ahead and answer the question.

14     A.      She compared me.  The only thing I know is she

15     compared me to Matt, who was 26 at the time.  I was 56.

16     I believe he was 26 at the time, but she wanted him in

17     the building.

18     BY MR. McLANDRICH:

19     **Q.      How do you know he was 26?**

20     A.      How do I know he was 26?  Maybe he told me.

21     **Q.      On what other occasions did she say that she**

22     **prefers white custodians?**

23     A.      She said the one time when she walked away.

24     **Q.      Is that the time that you already told me about?**

25     A.      Yeah.

Page 78

1    Q.      Any other times other than that one?

2    A.      Through her actions --

3    Q.      I'm asking about statements, not action.  We can

4    talking actions in a minutes, but I want to focus on

5    statements right now.

6    A.      I can't remember at this time.

7                    MR. GILBERT:  Can the court reporter

8    read that question back?

9                            - - - -

10   (Thereupon, the requested portion of the record was read

11                   back by the reporter.)

12                           - - - -

13   A.      There was another time we were doing a

14   walkthrough in the building as far as work permits, and

15   she had brought up the fact of her experience, you know,

16   with white custodians.

17   BY MR. McLANDRICH:

18   Q.      Did she use the word white?

19   A.      Yes.

20   Q.      What did she say?

21   A.      That her experience is better with white

22   custodians.

23   Q.      When was this?

24   A.      I don't remember when that was.  That was during

25   the time that Matt Bueser was there and I don't know if

1  she was talking about a previous custodian, or talking

2  about Matt Bueser at the time he was in the building.

3  **Q.      What was Boozer's position?**

4  A.      Assistant custodian.

5  **Q.      Was he a temporary or a permanent assistant**

6  **custodian?**

7  A.      He was filling in for me.

8  **Q.      Who was he filling in for?**

9  A.      He was filling in for me when I was off.  He

10  would come in in the morning.

11  **Q.      Did you work in the building at the same time as**

12  **Bueser?**

13  A.      Yes.  Well, I was in the building but he filled

14  in for me when I was off.

15  **Q.      Which time when you were off, do you know?**

16  A.      What do you mean?

17  **Q.      What were you off for?**

18  A.      Probably vacation.

19  **Q.      Any other times that you remember her making**

20  **statements that she preferred white custodians?**

21  A.      No.  I'm pretty sure that's it right now.

22  **Q.      If you think of any let me know.  On what**

23  **occasions did she say that she felt that black**

24  **custodians --**

25                      MR. GILBERT:  I just want to make sure

Page 80

1    that Mr. Garnett finished his answer.

2    BY MR. McLANDRICH:

3    **Q.      Did you have something else that you were going**

4    **to add?**

5    A.      No.

6                 MR. McLANDRICH:  We okay to go then,

7    Ed?

8                 MR. GILBERT:  Yeah.  Thank you.

9    BY MR. McLANDRICH:

10   **Q.      On what occasions did Ms. Bruce say that she**

11   **felt black custodians were too lazy and wouldn't do the**

12   **work?**

13   A.      She told me that she didn't want black

14   custodians in the building.

15   **Q.      Okay.  When did she say that?**

16   A.      She said that -- I remember one of the guys,

17   last name Whimbley.  I can't remember the other black

18   custodian that came out, but I believe after those two

19   were out of the building and she said she didn't want

20   them back in there, I believe.  I don't know for sure,

21   but after that time they never had another black

22   custodian in that building fill in, at least not for my

23   position.  I'm not 100 percent sure on that.

24                 MR. GILBERT:  He asked you when did

25   she say it?  When did she make that comment?

```
1   BY MR. McLANDRICH:

2   Q.      Let me start this over.  What I'm looking for

3   are statements by Ms. Bruce that she felt black

4   custodians were too lazy and would not do the work.

5   A.      I can't remember the date.

6   Q.      Okay.  Regardless of date she did say that, is

7   that what you're saying?

8   A.      Ask the question again.

9   Q.      Sure.  Did Ms. Bruce ever say black custodians

10  were too lazy and wouldn't do the work?

11  A.      She said she didn't want them in the building.

12  Q.      All right.  And when she said she didn't want

13  them in the building she was referring to Whimbley and

14  somebody else?

15  A.      Well, black custodians.

16  Q.      Did she use the words black custodians?

17  A.      Yes, she did.

18  Q.      She said I don't want black custodians in the

19  building?  Is that what she said?

20  A.      No.  She didn't say it like that.  Let me see.

21  Q.      Well, what did she say?

22  A.      She said the black men didn't come in there and

23  work, didn't work right.  Something to that effect.

24  They came in and did things half-ass, didn't work like

25  shit.
```

1   Q.      **And was she referring to those specific men, or**

2  **just black men in general?**

3   A.      She's speaking of black men in general.

4   Q.      **Did she say that on one occasion, or more than**

5  **one occasion?**

6   A.      More than one occasion.

7   Q.      **And to the best of your recollection when was**

8  **this?**

9   A.      Time, month?

10   Q.      **Month, year, whatever you got.**

11   A.      I don't remember.  I would be guessing.

12              MR. GILBERT:  John, are you ready to

13  take a lunch break any time soon?

14              MR. McLANDRICH:  Yeah.  In just a

15  minute.

16  BY MR. McLANDRICH:

17   Q.      **On how many occasions did she make that comment**

18  **about black men?**

19   A.      I didn't keep count of it.

20   Q.      **Two, five, 50, ten?**

21              MR. GILBERT:  Go ahead and answer, if

22  you can.

23   A.      I'm trying to think.  At least a couple of

24  times.

25  BY MR. McLANDRICH:

1  **Q.      You have a specific recollection of at least**

2  **twice?**

3  A.      Not right now I don't.

4  **Q.      So you have a specific recollection of once?**

5  A.      Sure.  The time that we were in the cafeteria

6  when she said the black man come in here and do things

7  half shit.  Why they come in here and do that.

8                    MR. GILBERT:  John, I do have a 12:15.

9  It won't last more than 15 minutes.

10                    MR. McLANDRICH:  That's fine.  We'll

11  take our break now.  What time do you want to come back?

12                    MR. GILBERT:  Is 12:45 adequate?

13                    MR. McLANDRICH:  Fine for me.

14                    MR. GILBERT:  Mr. Garnett, is 12:45

15  okay with you?

16  A.      Yes.  That's fine.

17                         - - - -

18    (Thereupon, an off-the-record discussion was held.)

19                         - - - -

20  BY MR. McLANDRICH:

21  **Q.      So, Mr. Garnett, I received from your lawyer**

22  **this morning a number of photographs of items.  A drill**

23  **and a battery charger and a coat and a pair of boats and**

24  **some other items.  I frankly don't have them all in**

25  **front of me.  Am I to understanding that you're now**

1   claiming there was more than a drill and battery charger

2   that was left in your locker and therefore missing?

3   A.      Yes.

4   Q.      And when did you come to this new recollection?

5   A.      It was probably almost a year later.

6   Q.      And how was it that you came to that

7   realization?

8   A.      I was in the basement of my home that I was

9   moving out of, which I did move out of, and as I was

10  cleaning up the basement and I know the weather was

11  changing I started thinking where was my winter gear and

12  that's when it triggered me to think that's what I left

13  in that locker.

14  Q.      So because you couldn't find the winter gear in

15  the basement you assumed that you left it in the locker

16  and it came up missing?

17  A.      No.  I didn't assume.  I knew I left it in

18  there.

19  Q.      The battery charger that you left in the

20  custodial locker, was it just the battery charger?

21  A.      What do you mean?

22  Q.      Did it perform functions other than being a

23  battery charger?

24  A.      I don't remember.

25  Q.      What do you mean you don't remember?

Page 85

1   A.      I don't remember.

2   Q.      **Did you ever use it for anything other than**

3   **charging a battery?**

4   A.      As a matter of fact, I don't think that I had

5   ever used it.

6   Q.      **So you took it to work but never had occasion to**

7   **actually use it?**

8   A.      I would have got that in probably 2016 when I

9   took over as a head custodian.  I bought a lot of

10  equipment, a lot of tools, a lot of gear that a head

11  custodian needs.

12  Q.      **So your best recollection as you sit here anyway**

13  **is that you bought the battery charger in 2016, took it**

14  **to work but never used it?**

15  A.      Yeah.  That's to my best memory, that's correct.

16  Q.      **Okay.  And to the best of your memory was it**

17  **just the battery charger?**

18  A.      If you're saying if it had other things on it, I

19  really don't remember.

20  Q.      **Why did you select the one that you send me the**

21  **picture of?**

22  A.      That was the one that I could best remember.

23  Q.      **I see it's a Dewalt.  Do you have a memory that**

24  **your battery charger was a Dewalt?**

25  A.      Not necessarily.  I don't remember what it was.

Page 86

1    Q.       The one that you sent me a picture of is not

2    just the battery charger, and that's why I ask you these

3    question.

4    A.       Well, I went by what it looked like.

5    Q.       Okay.  Do you have any receipts or box or

6    anything?

7    A.       No.  I looked for them on the computer, online.

8    I must have paid cash or I had some cards that was

9    cancelled at the time.  I couldn't find it.

10   Q.       All right.  When you say that you were moving

11   out of the basement, did you move homes or did you just

12   empty things out of the basement?

13   A.       I moved homes.

14   Q.       When did you move homes?

15   A.       Well, I was preparing to move -- I'm trying to

16   remember.  Actually I got to back up.  I got something

17   wrong.  Let me think.  I think in 2018, maybe in

18   November.  It's hard to remember.  It was 2019.

19                   MR. GILBERT:  What was 2019?

20   A.       In the fall of 2019.  I'm kind of confused right

21   now trying to remember.  I know I didn't even know on

22   that locker incident.  I forgot that I even had a second

23   locker.  So time went on, so it had to be maybe almost a

24   year or maybe in July, August maybe to the best of my

25   memory.

 1   BY MR. McLANDRICH:

 2   **Q.      What's this date that you're trying to come up**

 3   **with?**

 4   A.      I'm trying to think of when -- I remember it was

 5   a while that -- it took a little while for me to

 6   remember what was in that locker and I'm thinking July,

 7   August.

 8                   MR. GILBERT:  Mr. Garnett, you have to

 9   help us because we're both trying to figure out what

10   question you're responding to.

11   BY MR. McLANDRICH:

12   **Q.      Let's back up and start over.  So on August**

13   **31st, 2018 was when you went to Crouse, you got your**

14   **review and you cleaned out the one locker, right?**

15   A.      Yeah.

16   **Q.      And then some period of time later -- and**

17   **there's an e-mail and we could find it if we need to.**

18   **Where you wrote an e-mail about the second locker and**

19   **that's when you raised the issue of the drill and the**

20   **battery charger.  Do you recall that?**

21   A.      Yes.

22   **Q.      All right.  And then there's some period of time**

23   **between that e-mail and when you came to the realization**

24   **that you think these other items were also left behind?**

25   A.      Yeah.  It was some time had passed and I can't

Page 88

1   really remember now when it was, but some time had

2   passed and I remember the situation but I can't really

3   remember the time or date.

4   Q.      And I'm not so concerned with exactly when on

5   that.  At some point later you come to the realization

6   that you believe other items are missing, essentially

7   that's this winter clothing that you sent me pictures

8   of?

9   A.      Yes.

10  Q.      A jacket, bib overalls, and a pair of boots and

11  maybe something else?

12  A.      Yes.

13  Q.      And I think there was also a picture of a

14  handheld voice recorder?

15  A.      Yes.

16  Q.      What's that about?

17  A.      That's what it was.

18  Q.      And you're saying that was also in that locker?

19  A.      Yes.  That was something that I mentioned to

20  Matt Frame on August 31st.  I remembered that was in

21  there.

22  Q.      Okay.  We'd also been talking about the fact

23  that you moved homes and I had asked you when you moved

24  and then you were trying to think of that date.  Do you

25  recall when you moved?

Page 89

1    A.      Right now I can't even remember that.

2    **Q.      Was it this year that we're in, do you know?**

3    A.      Just let me think for a second.

4    **Q.      Sure.  Take your time.**

5    A.      I've been through a lot.  I can't even remember.

6    I can't remember.

7    **Q.      We'll move on.  If it comes to you, let me know.**

8    **Otherwise we'll cover some other things.**

9    A.      Okay.  I could probably get that information.

10   Can you hold on for one second?

11   **Q.      Sure.  Go ahead.**

12              MR. GILBERT:  John, what's your

13   understanding of what he's looking for?

14              MR. McLANDRICH:  I think it's the date

15   that he moved.  I'm looking for something proximate.

16   It's not that important.

17   A.      I think it was maybe September of last year.

18   BY MR. McLANDRICH:

19   **Q.      September of '19?**

20   A.      Yes.

21   **Q.      That's when you think that you actually moved?**

22   A.      Yeah.  Around that time.

23   **Q.      Approximately.  I understand.**

24   A.      Yes.  So that would have been, if I'm correct,

25   then I would have found out about the other items right

 1  before that.

 2  Q.     As you were starting to pack up and clean up to

 3  move?

 4  A.     Yes.

 5  Q.     All right.  Prior to this incident where the

 6  locks were removed from your locker had you had any

 7  issues with Trevor Schrom, any problems with him?

 8  A.     Yes.

 9  Q.     Tell me about that.

10  A.     Well, I had a problem with him smoking.

11  Q.     Okay.  Go ahead.

12  A.     I had a problem with him smoking.  He had verbal

13  warnings, written warnings.  I had problems a him

14  bringing weapons into the building, which I told him not

15  to bring weapons into the building anymore.  I asked him

16  to leave.  I actually asked him to leave the building

17  one time because he came in and he had a habit of

18  wanting to come in and take a break.

19         He was smoking again back in my chiller area and

20  I asked him how come he didn't start his work schedule.

21  He told me he was sick, so I asked him to leave.  I said

22  I can't have you working here while you're sick.  If

23  something happens to you, then that's on me.  He said

24  that he was going to call Buck, and I think he actually

25  called Buck.  I had problems with him doing things that

1  I didn't ask him to do and he knew that he wasn't

2  supposed to do, which he would get information from the

3  principal and even though I would tell him, look, we

4  don't move those desks and that's for grounds

5  department.  He would move items that he was instructed

6  not to.

7  Q.      **Anything else with him?**

8  A.      Yes.  There is, but that's all I can remember

9  for right now.  Like I said, he seemed like he actually

10 wanted to run the building is what it was.

11 Q.      **So the weapons, what kind of weapons were those?**

12 A.      Knives, hook knives, machetes.  He had a trunk

13 full of them.

14 Q.      **What did he actually bring into the building**

15 **itself?**

16 A.      A hook knife and a machetes.

17 Q.      **He brought a machete into the building?**

18 A.      Yes.  And also a knife with a funny type of grip

19 on it, that had a hook to it.  It was illegal.

20 Q.      **Okay.  What did he get the verbal and written**

21 **warnings for?**

22 A.      Smoking and I think it was -- I can't think of

23 any other ones if there was.

24 Q.      **Okay.  Did he ever make any racially disparaging**

25 **comments to you?**

1    A.      No.

2    Q.      **How about Nicholas Ache, what sort of problems**

3    **did you have, if any, with Nicholas Ache?**

4    A.      When Nicholas Ache came to the building I ended

5    up going back to the building one evening, he was

6    sitting back in the break room and I went to my locker,

7    which is right in front of the break table and he got

8    defensive like, what are you doing here in the building?

9    I'm not use to custodians coming back up to the

10   building.  So I was in my locker I told him I forgot

11   something and I left out of the building, but the next

12   day when he came into work I guess he lied to Donnelle

13   McNary and told her -- he came back to me and said

14   Donnelle said Mr. Garnett had come back to the building

15   to spy on people.  He said that McNary said that.  I

16   went to McNary and asked her, because of course it

17   didn't sound like her to me, and she said, of course she

18   didn't say that.

19          I said I've been having problems with a lot of

20   pool workers up in this building and if you want to work

21   in this building I expect you to come up here and start

22   on time.  I had to have him start his work at 2:30, he

23   needs to actually be on the floor because my job was

24   doing paperwork.  I told him if you want to work in this

25   building we've had these problems with pool workers

Page 93

1  before, I need to you come in and do your job.

2  **Q.      Any other problems with Nick?**

3  A.      That was pretty much it.

4  **Q.      No racial comments by Nicholas?**

5  A.      No.

6  **Q.      Is it possible that Ms. McNary deny that to you**

7  **even though she might have said it to him?**

8                    MR. GILBERT:  Objection.

9  A.      I knew McNary.  This guy was new, so I knew

10  McNary didn't say that.  He didn't deny that he didn't

11  lie.  He just kind of nodded his head like, okay, you

12  got me.

13  BY MR. McLANDRICH:

14  **Q.      What evidence do you have of a conspiracy**

15  **between Bruce and Frame?**

16  A.      Well, she had started calling him -- to my

17  knowledge, Matt Frame was called so much he was out of

18  the building 15 times, which I never knew he was out of

19  the building 15 times.  Every time -- if something

20  happened with the cafeteria where I couldn't get my work

21  done then she was calling Matt Frame to come out of the

22  building.

23  **Q.      Anything else?**

24  A.      As far as not removing the pool workers.

25  **Q.      Anything else?**

1   A.       There's other things.  I'll probably have to

2   come back to it.

3   Q.       **If you think of them, let me know.  When you're**

4   **saying not removing the pool workers, are you saying**

5   **that essentially you were complaining about the pool**

6   **workers but they weren't being taken out of the**

7   **building?**

8   A.       Yes.

9   Q.       **Are there any specific pool workers that I ought**

10  **to be aware of in that regard?**

11  A.       Yes.  Sam Page.

12  Q.       **P-A-G-E?**

13  A.       I would think so.

14  Q.       **Okay.  Anybody else?**

15  A.       Thomas Hill.

16  Q.       **Isn't Mr. Hill eventually removed?**

17  A.       He was removed, yes.  After the verbal assault.

18               MR. GILBERT:  Can he finish his

19  answer?

20               MR. McLANDRICH:  I'm not stopping him

21  from doing anything.

22               MR. GILBERT:  He asked you about the

23  pool workers.  You identified two.  Are there any more?

24               MR. McLANDRICH:  I was going to ask

25  him that if you gave me a chance, Ed.

1   A.      Yes.  Sheila.  I don't know her last name.

2   BY MR. McLANDRICH:

3   Q.      **Anybody else?**

4   A.      Linda Harris.

5   Q.      **These are all people that you asked to be**

6   **removed that you think weren't removed quickly enough?**

7   A.      Yes.

8   Q.      **They were all eventually removed and reassigned,**

9   **right?**

10  A.      Yes.

11              MR. GILBERT:  Have you completed your

12  answer?

13  A.      There was probably others.  Just off the top of

14  my head that's what I remember.

15  BY MR. McLANDRICH:

16  Q.      **Okay.  If you think of more, you'll let me know.**

17  **What's the basis of allegation that Schrom and/or Ache**

18  **cut the locks off your lockers based on some instruction**

19  **or plan by Bruce and/or Frame?**

20  A.      I don't understand the question.

21  Q.      **Sure.  The complaint alleges that the locks were**

22  **cut off your locker based on some instruction or order**

23  **or plan in place by Bruce or Frame.  I want to know the**

24  **basis of that allegation.**

25  A.      I'd like to say something and if you'd like to

1  ask me the question again, I'd like to answer my best,

2  but I never knew what the truth was.  I never knew what

3  the truth was.  There was allegation that somebody told

4  them to do it and then somebody said they didn't tell

5  them to do it.  I don't know what's going on with that

6  situation.

7  **Q.      But as we sit here you're not aware of Ms. Bruce**

8  **telling or planning with somebody to have them cut those**

9  **locks off your locker?**

10  A.      Are you asking me what I believe?

11  **Q.      I'm asking you what you know, not what you might**

12  **believe in your heart, but what you know in your brain?**

13  A.      Well, if you're not asking me what's in my heart

14  for facts.

15  **Q.      I'm asking for facts, not beliefs.  If there's**

16  **facts, I want those.**

17                    MR. GILBERT:  Objection.

18  A.      I don't have any facts.

19                    MR. GILBERT:  You could tell him what

20  you believe.

21                    MR. McLANDRICH:  Let's just deal with

22  facts for now.

23  A.      Like I said, I didn't understand the whole

24  situation.  There was a bunch of things as I listen to

25  people's deposition testimony, there's a lot of things

Page 97

1    that left me still confused on what actually happened.

2    BY MR. McLANDRICH:

3    Q.      And I appreciate all of that, but are you aware

4    of any facts that indicate to you that Ms. Bruce told

5    somebody to removed those locks off those lockers?

6    A.      No.

7    Q.      How about Mr. Frame, are you aware of any facts

8    that suggest to you that Mr. Frame told anybody to take

9    those locks off those lockers?

10   A.      No.

11   Q.      Are you aware of any facts that suggest the two

12   of them together had some plan or gave somebody some

13   direction to cut those locks off those lockers?

14   A.      Ask that again.

15   Q.      Sure.  Are you aware of any facts that indicate

16   Ms. Bruce and Mr. Frame together had a plan or gave

17   somebody an order to remove the locks from those

18   lockers?

19   A.      No.

20   Q.      Do you have any facts that suggest to you that

21   Trevor Schrom cut those locks off that locker because

22   you're African American?

23   A.      That, or he didn't like me, or both.

24   Q.      I get that, but let's just stick with African

25   American for now.  Do you have any facts that tell you

1  he cut those locks off your locker because you're

2  African American?

3              MR. GILBERT:  Asks for a legal

4  conclusion.  Go ahead and answer the question if you

5  can.

6  A.     The only facts that I have is that I'm black and

7  he's white and my locks were cut off.

8  BY MR. McLANDRICH:

9  Q.     Is that the same answer for Nicholas Ache?

10 A.     Yes.

11 Q.     Any additional facts that would suggest to you

12 that Nicholas Ache participated in cutting the locks off

13 your lockers because you're African American and he's

14 white?

15 A.     That's it.

16 Q.     The negative review or the review that was less

17 than completely satisfactory by Ms. Bruce, do you recall

18 appealing that to the Civil Service Commission?

19 A.     Yes.

20 Q.     And then they ordered that review to be redone,

21 correct?

22 A.     Yes.

23 Q.     And then you received that second review and you

24 signed it on August 31st, 2018, correct?

25 A.     Yes.

Page 99

1   Q.      And while it was somewhat different it still

2   wasn't as positive as your prior reviews, correct?

3   A.      Yes.

4   Q.      And because of that you appealed it again,

5   correct?

6   A.      Yes.

7   Q.      And on that second appeal the review was upheld

8   by the Civil Service Commission as being appropriate,

9   correct?

10              MR. GILBERT:  Objection.

11  A.      By default I would say.

12  BY MR. McLANDRICH:

13  Q.      By default in the sense that they didn't order

14  it to be redone and void the review, correct?

15  A.      When I got the paperwork back I was supposed to

16  appeal it in five days so when I went there and didn't

17  appeal that paper within five days, that's my

18  understanding.  I had nothing to say at that point.

19  Q.      But the order you didn't appeal was an order

20  finding the review to be valid, correct?

21  A.      Yes.  It wouldn't change.  They didn't change

22  it.  They left it like it was.

23  Q.      Let's go to Exhibit C, please.

24                      - - - -

25      (Thereupon, Defendants' Exhibit C was marked for

1              **identification.)**

2                       **- - - -**

3    A.      I got it.

4    BY MR. McLANDRICH:

5    **Q.      So this is the ruling from your hearing officer**

6    **for your first appeal of your January 1, 2017 through**

7    **June 30, 2017 grading period, right?**

8    A.      Yes.

9    **Q.      And it has the period of time up at the top if**

10   **you look.  "The grade sheet on appeal is for the time**

11   **period of January 1, 2017, to January 30, 2017," do you**

12   **see that at the top?**

13   A.      No, I don't.

14   **Q.      It's the second sentence of that first small**

15   **paragraph at the very top of Exhibit C.**

16   A.      You said Exhibit C, right?

17   **Q.      Yes.  It should say "The Civil Service**

18   **Commission" up in the right-hand corner.**

19   A.      Right.  I see that.

20   **Q.      And then the first sentence says "The following**

21   **is my written decision in regards to the grade sheet."**

22   A.      Yes.

23   **Q.      It goes on, and then the second sentence talks**

24   **about it being January 1, '17 through June 30, '17,**

25   **correct?**

Page 101

1    A.     Yes.

2                   MR. GILBERT:  Can we correct something

3    here?  This is the second --

4                   MR. McLANDRICH:  You're right, Ed.

5    When you're right, you're right.  My apologies.

6    BY MR. McLANDRICH:

7    Q.      **This is actually the second hearing of that same**

8    **grade sheet, the revised grading sheet.  This one denies**

9    **the appeal.  If you turn to the last page you'll see**

10   **where it says, "I am recommending that this appeal be**

11   **denied."**

12   A.     I don't have that.  It's just not there, but

13   I'll take your word for it.

14   Q.      **I don't want to you take my word for it.  It**

15   **should be seven pages back right, before Exhibit D.**

16                  MR. GILBERT:  If you're having

17   problems reading that Mr. Garnett, let us know.

18   A.     Okay.  Are we still on Exhibit C, though?

19                  MR. GILBERT:  We're talking about

20   Exhibit C.

21   A.     Okay.  I see Akron Board of Education.  Should I

22   keep going down?

23   BY MR. McLANDRICH:

24   Q.      **Yeah.  It's like seven pages back.**

25   A.     Okay.  What am I look for?

1  Q.      The very last sentence of the last page.

2  A.      Okay.  In conclusion?

3  Q.      Yes, sir.  It says, "In conclusion, to uphold

4  the appeal would be a disservice to both the students

5  and teachers at Crouse School.  Therefore, I am

6  recommending this appeal be denied," correct?

7  A.      Yes.

8  Q.      In that appeal in the ruling, and you could

9  certainly take time to read it, they found that there

10 were deficiencies at the building that justified the

11 review that was given.  Is that fair?

12 A.      No.

13 Q.      Is it not fair because it doesn't say that or

14 because you disagree with it?

15 A.      Ask your question again?  Since this was against

16 me, of course it's not fair because of all the things

17 that I was trying to do to keep the building clean.  I

18 was trying to get these pool workers to work.

19 Q.      Okay.  And that's your position generally about

20 any deficiencies with the building is that the pool

21 workers and/or the other custodians that were there,

22 they weren't doing their jobs and weren't working hard

23 enough, so if there was a problem with the building, it

24 was because of that, right?

25 A.      Not just the pool workers.

1  Q.      Well, I know not just the pool workers.  That's

2  what I'm saying.

3  A.      I didn't have an assistant custodian either.

4  Q.      Right.  I get that and so because you didn't

5  have an assistant they had given you the two six-hour

6  workers instead and the combination of whoever you had

7  there though that was working with you, your position

8  was that they weren't working hard enough and weren't

9  doing their jobs, so if there was a problem with the

10 building that was why?

11 A.      Yes.  And also my argument was too in order to

12 even downgrade someone to a 70, you would have to have

13 verbal warnings, written warnings, paperwork to support

14 that.

15 Q.      Okay.  And is there any policy or procedure or

16 rule in the union contract anywhere that you're aware of

17 that says there has to be these interim warnings?

18 A.      It was on the back of the evaluation page.

19 Q.      Are you aware of whether the buildings in the

20 Akron Public School systems have different

21 classifications?

22 A.      What do you mean?

23 Q.      Where the building will be --

24 A.      Yes.  Yes.

25              MR. GILBERT:  Wait for Mr. McLandrich

Page 104

1    to finish.

2    A.      Okay.

3    BY MR. McLANDRICH:

4    Q.      Let's go to Exhibit I.  That's the union

5    agreement, The Collective Bargaining Agreement.

6                        - - - -

7         (Thereupon, Defendants' Exhibit I was marked for

8                        identification.)

9                        - - - -

10   A.      I got it.

11   BY MR. McLANDRICH:

12   Q.      Would you go to page 42, and the page numbers

13   are at the bottom?

14                   MR. GILBERT:  John, I don't have my

15   whole document here.  If you're going to refer to a

16   section, can you read it into the record so we're all

17   together on it?

18                   MR. McLANDRICH:  I'll be happy to.

19   A.      I don't have it yet.

20   BY MR. McLANDRICH:

21   Q.      Take your time.  I'll read it into the record.

22   Before I do that let me ask this question:  So Crouse is

23   a Class II building, correct?

24   A.      I don't remember.

25   Q.      I hate to do this to you -- let's deal with this

1   and we'll go back because we have to reference another

2   exhibit to answer that question.  Section 5.18, and I'll

3   read it into the record.  "A. School buildings will be

4   classified as to number of full time and five (5) hour

5   custodial employees assigned to the buildings.  The

6   classification will be:  Class I, 1 - 2 1/2 employees;

7   Class II, 2 5/8 - 5 1/2 employees; Class III 5 5/8 or

8   more employees.  B.  Five (5) hour custodial help will

9   be counted as 5/8 of an employee.  Student help shall

10  not count toward employees assigned."

11          That's the whole section.  So we can go there,

12  but on Exhibit G it reflects that is Crouse is a Class

13  II building.  You could go to G if you want to confirm

14  that I'm saying it correctly.  Crouse C II, meaning

15  Class II, correct?

16  A.      I'm not there.

17                      - - - -

18      (Thereupon, Defendants' Exhibit G was marked for

19                  identification.)

20                      - - - -

21              MR. GILBERT:  It says Class the

22  numeral II and then a three.

23              MR. McLANDRICH:  Right.  For three

24  employees.

25              MR. GILBERT:  How do you figure that?

Page 106

1                    MR. McLANDRICH:  Well, if you look at

2       the others, Bridges says two, there's two employees.  If

3       you look at Case there's two full-time employees, and a

4       five-hour worker, which we know is 5/8 employee so

5       that's 2 5/8.  Crouse shows three full-time workers,

6       three.

7                    MR. GILBERT:  And you're asking him to

8       verify that?  Is that what you're saying?

9       BY MR. McLANDRICH:

10      Q.      I guess the first question is do you agree that

11      Crouse is a Class II building?

12                   MR. GILBERT:  Objection.

13      A.      If it says that.

14      BY MR. McLANDRICH:

15      Q.      All right.  Do you have any reason to believe

16      that Crouse is something other than a Class II building?

17      A.      No, I don't.

18      Q.      If Crouse is a Class II building pursuant to

19      Section 5.18 it would have between 2 5/8 and 5 1/2

20      employees, right?

21                   MR. GILBERT:  Objection.

22      A.      I don't see it.  I don't have it.  I'm lost, but

23      do you have a question?

24      BY MR. McLANDRICH:

25      Q.      Yeah.  If we look at page 42 of the Collective

1   **Bargaining Agreement, which is Exhibit I --**

2                   MR. GILBERT:  I'm going to object.

3   You're asking him to interpret the bargaining agreement

4   and I don't know that this witness is qualified enough

5   to do that.

6                   MR. McLANDRICH:  Ed, I appreciate it

7   but as you well know the rules on depositions allows you

8   to say the word objection and that's it.

9                   MR. GILBERT:  I disagree.

10                  MR. McLANDRICH:  Well, then you might

11  want to read the rule because I read it over the lunch

12  hour.

13                  MR. GILBERT:  I can give a reason for

14  an objection.

15                  MR. McLANDRICH:  Not if you comply

16  with the rule.  With that said, I'm not asking him to

17  interpret the agreement.  I'm asking him to read what

18  section 5.18 says and whether I'm reading it correctly.

19  If he wants to disagree with its meaning, he's free to

20  do that.

21                  MR. GILBERT:  Mr. Garnett, you can

22  answer the question if you understand it.

23                  MR. McLANDRICH:  That goes for every

24  question.

25                  MR. GILBERT:  Well, don't try to

1    interpret the law or interpret the contract.

2    A.      I'm still try to find the place.  I see the

3    classification of building, building service, employees

4    and then there's letter A, school buildings will be

5    classified, is that where you are?

6    BY MR. McLANDRICH:

7    **Q.      Are you on Exhibit I?**

8    A.      5.18?

9    **Q.      Yes.  Yes.  Do you see where it says "Class II?"**

10   A.      Yes.

11   **Q.      And then it says, "2 5/8 - 5 1/2 employees,"**

12   **correct?**

13   A.      Yes.

14   **Q.      Do you have an understanding that that means a**

15   **Class II building is going to have between 2 5/8 and 5**

16   **1/2 employees?**

17            MR. GILBERT:  Objection.  You can

18   answer if you understand.  Don't guess or speculate.

19   A.      I'm not sure.

20   BY MR. McLANDRICH:

21   **Q.      It's up to the district to decide what employees**

22   **they assign to a given building, right?**

23   A.      Yes.

24   **Q.      We're still on Exhibit I.  Before I do that, Mr.**

25   **Garnett, with respect to these items that you claim were**

1   stolen, did you ever make a claim under your home

2   owner's insurance for the theft of those items?

3   A.      No.

4   Q.      Is there any reason you didn't?

5   A.      I thought the board was going to take care of

6   it.  I thought the board was going the pay for it.  And

7   then I couldn't even remember the winter items until

8   months later.

9   Q.      Please go to page 51 of Exhibit I.

10  A.      Got it.

11  Q.      Before we get to that let me just ask you, you

12  were a member of the Service Employees International

13  Union Local 1 Firemen and Oilers Division 100

14  Maintenance, Buildings, Grounds, Warehouse and

15  Transportation Employees?

16  A.      Yes.  I believe I was.

17  Q.      Okay.  So the bottom of that page section 7.03,

18  do you see this, "principal permits?"

19  A.      Yes.

20  Q.      And I'll just, again, read it into the record

21  for Mr. Gilbert's benefit.

22          "A. The term 'principal's permit' as used in

23  this Article VII shall mean a principal's permit as that

24  term is defined in the current (as of the date of

25  ratification) Board's Administrative Procedures for Use

1   and Rental of Facilities, or any subsequent amendments

2   or modification made thereto by the Board or Business

3   Affairs Office in compliance with Section 5.08(B) of

4   this Agreement?"

5           "B.  Principal's permits are granted without

6   custodial service during the time that permit is in

7   effect."

8           "C.  Areas used for principal's permits shall be

9   cleaned pursuant to the assign custodian's regularly

10  posted schedule."  Are you at all familiar with that

11  section?

12  A.      The bottom two sound familiar to me.  The very

13  first one you read I have no understanding of that.

14  Q.      That's fine.  Your understanding of B and C

15  essentially is while the people are there there wouldn't

16  be a custodian, and then afterward the areas they used

17  would just be cleaned during the normal course of the

18  custodian's duties.  Is that your understanding?

19                  MR. GILBERT:  Objection.

20  A.      Read that again -- say that again.

21  MR. McLANDRICH:

22  Q.      Sure.  It looks like you're reading, so go ahead

23  and read and then I'll ask you.

24                  MR. GILBERT:  You can answer the

25  question when you're ready Mr. Garnett, but I don't want

1    to you guess or speculate.

2                    MR. McLANDRICH:  I don't either.  When

3    you're finished reading let me know and I'll ask you

4    again.

5    A.      Okay.  Go ahead.

6    BY MR. McLANDRICH:

7    Q.      **Do you have an understanding of what**

8    **subparagraphs B and C of section 7.03 mean?**

9    A.      Yes.

10   Q.      **And what's your understanding?**

11   A.      What it says.

12   Q.      **Okay.  I'm just going to tell you what I think**

13   **it says and then you can tell me if we're on the same**

14   **wavelength.**

15                    MR. GILBERT:  Objection.

16   BY MR. McLANDRICH:

17   Q.      **So what I think B says is that while the permits**

18   **in effect, while the people are there, there's no**

19   **custodian being provided.  Is that how you read B?**

20                    MR. GILBERT:  Objection.  Don't guess

21   or speculate.  Go ahead and answer, if you can.

22   A.      Ask the question again.

23   BY MR. McLANDRICH:

24   Q.      **So what B says is that while the permit is in**

25   **effect, while the people are there, no custodian is**

Page 112

1  going to be servicing, right?

2              MR. GILBERT:  Objection.  Don't guess

3  or speculate.

4  A.     Well, I don't really understand what you're

5  asking.  I don't understand.

6  BY MR. McLANDRICH:

7  Q.     Okay.  Let's just do it a little differently

8  then.  You tell me, what does it say?

9              MR. GILBERT:  Objection.

10 BY MR. McLANDRICH:

11 Q.     What's your understanding of what it says?

12             MR. GILBERT:  Objection.  You can

13 answer if you know, but don't guess or speculate.

14 A.     I'm not really sure what he's asking me.  So I

15 mean --

16 BY MR. McLANDRICH:

17 Q.     I'm asking you what understanding do you reach

18 when you read those words?

19 A.     My understanding is what it says, "Principal's

20 permits are granted without custodial service during the

21 time that the permit is in effect."  That's what it

22 says.  I don't have an understanding outside of what it

23 says right there.

24 Q.     And the same is true for C, your understanding

25 is what it says?

Page 113

1    A.      Yes.

2    Q.      All right.  And how about 7.04 C, is your

3    understanding of that also what it says?  Take time to

4    read it and then answer my question.

5                    MR. GILBERT:  Objection.  Don't guess

6    or speculate.

7    A.      I don't understand that paragraph.

8    BY MR. McLANDRICH:

9    Q.      Okay.

10                   MR. GILBERT:  What paragraph is that,

11   Mr. Garnett?

12                   MR. McLANDRICH:  7.04 C.

13   A.      Oh, I thought you meant A.

14   BY MR. McLANDRICH:

15   Q.      No.  I'm talking about C.

16   A.      Okay.

17                   MR. GILBERT:  Again, I'll raise the

18   objection of interpreting the union contract.

19   A.      Okay.  What it says.  Yeah.

20   BY MR. McLANDRICH:

21   Q.      Okay.  Again, I'll just read it for the record

22   since Mr. Gilbert may not have it in front of him.  7.04

23   is "Business Affairs Office Permits."  Subsection "C.

24   Areas use for Business Affairs Office permits shall be

25   cleaned pursuant to the assigned custodian's regularly

1   posted schedule."  Would you go to page 67 of the

2   Collective Bargaining Agreement, Exhibit I, please?

3   A.      Got it.

4   Q.      This section is entitled "Theft and Vandalism".

5   I can read the whole thing if you'd like, but let me

6   just start with the first paragraph and then I could

7   read some other portions, if you'd like.

8           "Theft and Vandalism.  The Board agrees to

9   establish a Theft and Vandalism Fund in the amount of

10  $2,000.  This fund shall be maintained annually at the

11  beginning of each school year at the above-stated

12  amount.

13          Members may make application to the Theft and

14  Vandalism Fund for reimbursement of any personal

15  insurance deductibles resulting from claims submitted

16  for job-related theft and/or vandalism.  Members may

17  also apply for reimbursement for any documented

18  job-related theft or vandalism that has been submitted

19  under an insurance policy and denied coverage under a

20  specific exclusion."

21              MR. McLANDRICH:  I could read the

22  rest, if you'd like.  I'll skip the third paragraph,

23  unless you want me to read it, Ed?

24              MR. GILBERT:  I'm waiting on a

25  question.

1           MR. McLANDRICH:  We'll get to that but

2    I'm just trying to put it in the record since you may

3    not have it in front of you.

4    BY MR. McLANDRICH:

5    Q.      Fourth paragraph "In addition to theft and

6    vandalism, the fund may be used to reimburse any

7    property loss suffered by a member resulting from

8    circumstances beyond the member's control.  Questions

9    concerning the appropriateness of reimbursement under

10   these circumstances shall be decided by the MOT Concerns

11   Committee and the Office of Staff Relations."

12           So my question is a very simply once, which is

13   A, were you aware of the availability of this fund?

14   A.      No.

15   Q.      And then I take it, B, you've never been asked

16   to been reimbursed for your loss under this provision?

17   A.      No.  What do you mean reimbursed?

18   Q.      Paid back.  Compensated.

19           MR. GILBERT:  Mr. Garnett, you said

20   something and I didn't pick up what you said.  What was

21   that?

22   A.      I did ask to be reimbursed.

23   BY MR. McLANDRICH:

24   Q.      He asked the district to be reimbursed but not

25   specifically under this fund under the union contract,

Page 116

1   correct?

2   A.      Yes.

3   Q.      Would you go to page 38 of the Collective

4   Bargaining Agreement, please?

5   A.      Got it.

6   Q.      So this section, why don't you take a chance to

7   read it a little bit and then I'll ask you a question.

8                   MR. GILBERT:  What's the section

9   number?

10                  MR. McLANDRICH:  I'm sorry.  5.14

11  Absentee Replacement.

12  BY MR. McLANDRICH:

13  Q.      It's a very general question, so you could feel

14  free to read it, but my question is basically this

15  section talks about when a certain custodian or

16  assistant custodian is out of the workplace how they're

17  replacement is provided for, correct?

18                  MR. GILBERT:  Go head and read it

19  thoroughly before you respond.  Again, my objection is

20  noted in asking questions about this contract.

21                  MR. McLANDRICH:  Sure.

22  A.      Okay.

23  BY MR. McLANDRICH:

24  Q.      So that section generally talks about how people

25  are filled in if the custodian is missing or an

1   assistant custodian is missing, that sort of thing,

2   correct?

3   A.      Yeah.

4   Q.      Would you go to page 23, please.  Before I ask

5   you that, Mr. Garnett, did you feel like there was too

6   much work being placed on you and that the distribution

7   of work between you and your subordinates wasn't

8   appropriate?

9   A.      The workers that I had in the building weren't

10  doing their job.  With better workers the job could have

11  gotten done.

12  Q.      All right.  And as I understand it, were there

13  occasions -- did you do those workers reviews for them?

14  A.      Yes.

15  Q.      How would you do that?

16  A.      Sometimes -- well, most of the time when I

17  attend my stepdown with Tom Kekela, they'd end up being

18  thrown out.

19  Q.      I'm sorry.

20  A.      We had pool worker evaluation slips.

21  Q.      And how do you know they would be thrown out

22  when they were sent to Mr. Kekela?

23  A.      When Matt Frame took over the position he told

24  me that I had to redo some.

25  Q.      Did he say that's because they were missing or

1  **thrown out?**

2  A.    He said Kekela didn't do good paperwork or

3  something along those lines.  He didn't have a paper

4  trail or something like that.  So sometimes I would

5  e-mail just to make sure that they got it and there was

6  a record of it.  Most of the time they actually went in

7  the pony.

8              MR. GILBERT:  In what?

9  A.    We'd fill out the paper and we would put it in

10  the pony, what we call the pony.  A yellow envelope for

11  buildings and grounds.  Someone would come by and pick

12  it up, grabbing everybody's pony.

13              MR. GILBERT:  Inner office mail?

14  A.    Yes.

15              MR. GILBERT:  What section is page 23,

16  please?

17              MR. McLANDRICH:  I decided not to ask

18  him about that.

19              MR. GILBERT:  Okay.

20  BY MR. McLANDRICH:

21  **Q.    When there were deficiencies cited in the**

22  **cleanliness of Crouse by Ms. Bruce or Mr. Frame or**

23  **Mr. Nash, are you contending that those cleanliness**

24  **issues didn't really exists?**

25  A.    No.  That was never an argument of mine.

1   Q.      So really the argument was that while these

2   cleanliness issues might exists it's because the other

3   custodians aren't, as you say, doing their jobs?

4   A.      Yes.  That's part of it.  The building would get

5   cleaned when I would come in in the morning because I

6   would have to do their work at night.  I did my work, I

7   did the assistant's work that I didn't have, and also

8   did the pool worker's work.

9   Q.      Now did you feel that Mr. Ache did a good job of

10  cleaning?

11  A.      He did an excellent job and as a matter of fact,

12  once they put Mr. Ache in the building and took the

13  other two guys out, so Ache replaced two guys, the

14  principal never complained.

15  Q.      And was Mr. Ache in the building twice?  Did he

16  come first as a pool worker and then come back later as

17  the assistant custodian?

18  A.      Yeah.  I think he was a pool worker and then a

19  year later he was an assistant.

20  Q.      When he came back as an assistant were you

21  already gone on leave?

22  A.      Yes.

23  Q.      So your experience with him being an excellent

24  worker would have been while he was a pool worker?

25  A.      Yes.

1  Q.      **Was he a five or an eight-hour at that time, do**

2  **you recall?**

3  A.      He was eight.  He was working eight hours.

4  Q.      **And do you recall who the individuals were that**

5  **he replaced?**

6  A.      Actually one of the guys was Mikal.  Mikal was

7  somebody that I wanted to keep, and Thomas Hill I

8  believe it was.

9  Q.      **And you were happy to see Thomas Hill go, right?**

10  A.      Yes.

11  Q.      **And so sounds like the switch of Ache for Mikal**

12  **and Hill was a positive thing?**

13  A.      Yes.  The principal really liked him.

14  Q.      **Sounds like you liked him at least as a worker?**

15  A.      I just wanted someone to come in and do what

16  they were supposed to.

17  Q.      **And he did that?**

18  A.      Yes.  After I talked to him a few times.  The

19  beginning was a little rocky, but once I spoke with him

20  everything was fine.

21  Q.      **You showed him some supervision and he respond**

22  **to that?**

23  A.      Yes.

24  Q.      **When you were talking about the 2007 appointment**

25  **interview that you were supposed to have with Mr. Ferris**

1  **and your mother I believe had passed away?**

2  A.      Right.  I believe it was 2007.

3  Q.      **Isn't my memory correct that you ended up having**

4  **to cancel that interview with him because of your**

5  **mother?**

6  A.      My mother died on a Saturday, I called early

7  Monday and I asked Mr. Ferris, I said Mr. Ferris my

8  mother just passed away.  Can I reschedule this

9  appointment for later on this week?  He told me no.  It

10  was already scheduled so I had to meet him.

11  Q.      **So then you went ahead and met him?**

12  A.      Yes.

13  Q.      **Did you ever file any grievances through the**

14  **union?**

15  A.      About that moment?

16  Q.      **About anything in general.**

17  A.      Yes.  I believe I did.  To my best knowledge I

18  believe I did.

19  Q.      **Do you recall what it was?**

20  A.      No.

21  Q.      **When was the last time that you saw a noose at**

22  **Akron Public Schools?**

23  A.      Probably a few months after it started.

24                    MR. GILBERT:  Say that again.

25  A.      In '02.

1    BY MR. McLANDRICH:

2    **Q.        So whenever the incident in '02 started and**

3    **ended that was the only time that you were exposed to a**

4    **noose at Akron Public School?**

5    A.        You're just speaking on the noose.  Yes.  That

6    was the only time.

7    **Q.        And it's my understanding that from your OCRC**

8    **charge back in '02 that they also used the N word with**

9    **respect to you or around you?**

10   A.        Yes.

11   **Q.        Did you ever hear that word at Akron Public**

12   **Schools outside of the incident of 2002?**

13   A.        No.

14   **Q.        After you filed the police report concerning the**

15   **cutting the locks off your lockers did you ever have any**

16   **follow-up with the police?**

17   A.        I had plenty of follow-up for six months.  It

18   was like pulling teeth.

19   **Q.        And by that do you mean that you would call them**

20   **but they wouldn't get back to you?**

21   A.        I would call them, ask them questions, how come

22   they can't get in touch with this guy.  Something like

23   they didn't have his address and I told them that he

24   worked up at the school.  Like they couldn't get in

25   touch with him.

1    **Q.        Okay.  Earlier you were talking about Ms. Bruce**

2    **and you're saying that she would adopt this submissive**

3    **posture.  Do you recall?**

4    A.        Yes.

5    **Q.        And I don't understand what that submissive**

6    **posture is and I'm hoping you'd describe it to me.**

7    A.        Yes.  Yes.  Let me help you.  If you would have

8    been walking down the hall and you would have seen the

9    way that she was against the wall and you would have

10   seen us talking, maybe your eyebrows would have raised

11   saying I wonder what that conversation is about.  Does

12   that make sense?

13   **Q.        Yeah.**

14   A.        Like she was at the club.

15   **Q.        Okay.  And I get that as far as it goes, but**

16   **what I would like to understand is where are body parts?**

17   A.        Okay.  Her shoulders are touching the wall,

18   maybe a left foot is out further to get the lean where

19   her back shoulders are touching the wall, and her right

20   leg is placed up against the wall and both hands are

21   behind her back.  Does that give you a clear picture?

22   **Q.        That's great.  I appreciate that.  That's a good**

23   **description.  So that was the position that she adopted**

24   **on the elevator?**

25   A.        Same one, yes.

Page 124

1    Q.      Also in the bathroom?

2    A.      I didn't say she had that position in the

3    bathroom, but she was pretty close to me in the

4    bathroom.

5    Q.      I'm sorry.  You said in the boiler room when she

6    was in the boiler room --

7    A.      In the -- I'm sorry.  Finish your question.

8    Q.      That's okay.  In my notes I wrote in the

9    elevator she had that submissive position, and then I

10   think you also said when you were in the boiler room or

11   out by the chiller area.

12   A.      Chiller area, yes.

13   Q.      Same posture?

14   A.      Yes.

15   Q.      So it's my understanding that there was a time,

16   I guess it would have been -- I could find the exact

17   date, but it would have been in 2017 when you got

18   slapped on the back of your head or neck by a student.

19   Do you remember that?

20   A.      Yes.

21   Q.      Was it 2017?

22   A.      Yes.

23   Q.      And do you recall telling the people at Portage

24   Path that in your mind you somehow you thought that that

25   might be related to the 2002 incident?

1    A.      Exactly.

2    **Q.      And what was it that made you think that the**

3    **student slapping you like that was related to the 2002**

4    **incident?**

5    A.      Well, after I got hit in the head all my

6    paranoia began to come back and I had got to the point

7    where -- that's it.  All my paranoia resurfaced.

8    **Q.      Okay.  So I'm not looking to put words in your**

9    **mouth but I am looking to understand.  When you say**

10   **"paranoia," what that suggests to me is that**

11   **intellectually you realize that the fear that the**

12   **student slapped you because of the 2002 incident isn't**

13   **intellectually valid, but in your emotional side you**

14   **have that certainty.  Am I hearing you right?**

15   A.      I'm sorry.

16              MR. GILBERT:  Finish your answer.

17   A.      When it comes to Portage Path, when you made

18   that statement, I don't know if I said that to her or

19   not.  I don't actually remember saying that.  I'm not

20   saying that I didn't say it, but I don't remember saying

21   that.

22   BY MR. McLANDRICH:

23   **Q.      I can get out the report.  I wouldn't have just**

24   **made that up.**

25   A.      If anything I would have said that after that

1  hit in the head things started resurfacing again to

2  where at that time I became in fear for my life again.

3  That's related to the hangman noose situation.

4  **Q.**     **And that extended to being in fear of the**

5  **students at the school, correct?**

6  A.     I began to -- there was a situation that I was

7  uncomfortable with a student that didn't mean me any

8  harm, but they raised a hand up to give me a high five

9  and I actually put myself in a blocked position because

10  I thought they were trying to hit me.

11  **Q.**     **And so you did have then some fear of the**

12  **students being potentially assaultive toward you?**

13  A.     I began to be uncomfortable.

14  **Q.**     **And you relate that back to your concerns of**

15  **2002 coming back to you?**

16  A.     Well, there were other things that were

17  happening to the building that started coming back up,

18  yes.

19  **Q.**     **I'm talking about the students.**

20           MR. GILBERT:  Objection.  Do you

21  understand the question?

22  A.     Ask it again.

23  BY MR. McLANDRICH:

24  **Q.**     **Sure.  You started to have a fear of being**

25  **around the students because of being slapped on the back**

Page 127

1    **of the neck.  Is that true?**

2    A.      I was uncomfortable.  There was one incident to

3    where somebody went to give me a high five and it was a

4    little girl.  I was standing at the lunch table and when

5    she went to give me a high five I put my hands up

6    because I thought she was going to hit me.

7    **Q.      And Crouse is an elementary school, right?**

8                    MR. GILBERT:  I'm not sure if he

9    answered your question.  That was different from the

10   other slap on the head, or is that the same incident?

11   A.      This is different.

12                   MR. McLANDRICH:  I think he was trying

13   to give this an as example of being concerned about the

14   students in reaction to being slapped.

15                   MR. GILBERT:  I just want to make it

16   clear that the slap on the head was not a girl giving

17   him a high five.

18                   MR. McLANDRICH:  I understood that.

19                   MR. GILBERT:  That's correct,

20   Mr. Garnett?

21   A.      Okay.  If you're saying fear of the students as

22   far as working around them, is that what you're asking

23   me?

24   BY MR. McLANDRICH:

25   **Q.      I'm asking if you started to have concerns about**

1   **being around the students as a result of being slapped**

2   **on the back of the head and you gave me that example.**

3   A.      I'm answering your questions the best I can.

4   When you asked me a situation and you're talking about

5   Portage Path, that was a situation where I told her

6   that, you know, somebody went to give me a high five and

7   I threw my hands up in front of my face as if I thought

8   they were going to hit me.  We're talking about one

9   incident.  I just looked at that one incident and

10  thought, wow, if I wasn't slapped on the head maybe I

11  wouldn't be on the defense with a little girl trying to

12  block myself.

13  **Q.      I appreciate that.  Did you also find your PTSD**

14  **growing worse after being slapped on the back of the**

15  **neck?**

16  A.      Actually, yes.  I didn't even know that I had

17  that PTSD.  That's how it was explain to me.  I just

18  explained to the doctor what I was going through and

19  experiencing, that's what they diagnosed me with.  If

20  you're asking after the slap in the head, did my

21  paranoia get worse?

22  **Q.      Sure.**

23  A.      Yes.  Yes.  And there was reasons for that too.

24  There were things happening.

25  **Q.      What does that mean, sir?**

1  A.       Well, when I started coming to my building, and

2  this is me feeling the whole time that I'm being set up

3  for whatever, back in '02 I was in fear for my life so I

4  began being in fear for my life again.  What I mean is

5  when I would come to work sometimes my building is wide

6  open, no alarm on it.  So I'm like who did that?  Why am

7  I coming into my receiving door?  There's a button in

8  the office that if it's left down the receiving door is

9  wide open, and there's no alarm on it.  So I'm like

10  who's in here waiting for me, setting me up.

11        One time the doors were wide open and the lights

12  were out.  We had automatic lights and the lights come

13  on at a certain time.  As I'm going through my building

14  I walk up the stairs and there's a white guy that comes

15  around the building with a gun on his hip.  Now I don't

16  know who this guy is, but he stopped all the sudden and

17  I'm looking at him and he's look at me.  Come to find

18  out it was security for the building.  They were saying

19  that an alarm went off, but when I came up to the

20  building there was no alarm.  That added to my paranoia.

21  Why is this guy walking through the building with a gun

22  on his hip?  He did work for the Board of Education, but

23  there was no alarm on when I came into my building, so

24  I'm thinking now I'm going to be an accident.

25        I believe he was a regular worker for the Board

1  of Education, but did maybe part-time security.  I

2  called Matt Frame on that and I explained to him there

3  was a guy in the building with a gun and my alarm wasn't

4  going off like he said it was when I came up to the

5  building.

6  **Q.      Anything else about that?**

7  A.      No.  That's it.  About my paranoia?

8  **Q.      No.  About that incident.**

9  A.      Okay.

10          MR. GILBERT:  Are you done with that?

11  A.      If we were talking about paranoia where it got

12  worse, I have other examples.

13  BY MR. McLANDRICH:

14  **Q.      Go ahead and give me the other examples.**

15  A.      I used to feel real bad -- I'm trying not to get

16  emotional.  I used to feel bad because I never told my

17  wife I was afraid to go to work.  So what I would do, I

18  would get up -- because we had before school care, I

19  would get there at 6:30 in the morning, so it's still

20  dark and because I stayed so close to the building, two

21  blocks, I would have my wife come downstairs and I would

22  have her look out the window.  I said just watch me walk

23  to the first block.  When I would get to the school, and

24  after seeing that guy in the building with the gun,

25  sometimes I would just sit out on the bench just to get

1    up enough courage to go into the building.  It was as if

2    I had to accept -- in order for me to go to work because

3    I worked through lot of things I had to accept in my

4    mind my death in order to go to work.

5    Q.       Is that going back to the 2002 incident or is

6    this because you saw the man with the gun?

7    A.       Yes.  It all stems from '02.  If I never had the

8    '02 incident where I feared with my life, maybe if I saw

9    the guy with the gun and he told me he was security it

10   may have been something I could have let go at that

11   time.

12   Q.       It sounds like seeing the guy with the gun

13   instead of making you feel more safe, it made you feel

14   less safe?

15   A.       I was feeling unsafe even before him.

16   Q.       I get that, but it sounds like seeing him made

17   you feel less safe and not more safe?

18   A.       Yes.  Having my building wide open when I

19   entered knowing how people felt about me.

20   Q.       And was having your wife watch you walk part of

21   the way to work partly because of the neighborhood or

22   because of the school?

23   A.       I wasn't afraid of the neighborhood although

24   there was a lot of things that happened in the

25   neighborhood, but that's some things that I grew up

1  around.  The neighborhood had its issues, and like I

2  said, it wasn't a popular place for custodians to live,

3  but I was willing to work anywhere and get any school as

4  far away from my experience in '02.

5  Q.      The only reason I ask that is because you said

6  that you would have her watch you walk the first block

7  and that seems to me that has more to do with the

8  neighborhood than the school, but you tell me.

9  A.      No.  As a matter of fact, Trevor Schrom tried to

10  come in early in the morning.  I told him I don't want

11  nobody in this building before I get here.  I didn't

12  know what these guys had in store for me.

13              MR. GILBERT:  What guys?

14  A.      It wasn't the neighborhood.  I'm talking about

15  Tom Kekela, John Beverlin or Matt Frame.  I walk my dog

16  in my neighborhood at 1:00 in the morning, 2:00 in the

17  morning.  For some reason walking by dog and going to

18  the school was totally different for me.

19              MR. GILBERT:  Wait for a question.

20  A.      Okay.

21  BY MR. McLANDRICH:

22  Q.      Other than the 2002 incident have you had any

23  other litigation with Akron Public Schools?

24  A.      You mean filing charges?

25  Q.      I'm talking about actual lawsuits.

1  A.      No.

2  Q.      **After you were hit in the back of the neck by**

3  **the student you went out on a Workers' Comp claim,**

4  **correct?**

5  A.      At some point.  I don't know if I went out on a

6  Workers' Comp.  I know I have something to do with

7  Workers' Comp.  I have a Workers' Compensation claim.

8  Q.      **You don't recall whether you missed time from**

9  **work because of that incident?**

10  A.      I think it was due to -- yes.  I did miss some

11  time.

12  Q.      **And after that incident you had continuing**

13  **problems with your neck from that, which apparently you**

14  **still go to the chiropractor for, right?**

15  A.      I want to still go to the chiropractor.  It's an

16  argument whether or not I can -- I think they had some

17  kind of a meeting to see if I could continue treatment.

18  But yes, I still have problems with my neck if that's

19  what you're asking me.

20  Q.      **So when did you first start to consider**

21  **disability retirement?**

22  A.      I probably started thinking about it -- I know

23  the PTSD was getting bad, but when I couldn't bid on

24  buildings and found out I couldn't get out of Crouse or

25  leave that situation I thought about possibly getting

Page 134

1    the ball rolling as far as disability.  I never wanted

2    to retire.

3    **Q.      So the unfavorable job review was some time**

4    **after June of 2017, right?**

5    A.      Yes.

6                  MR. GILBERT:  John, can I take a quick

7    break to run to the restroom?

8                  MR. McLANDRICH:  That's fine.

9                          - - - -

10     (Thereupon, an off-the-record discussion was held.)

11                         - - - -

12                 MR. McLANDRICH:  Back on.

13   BY MR. McLANDRICH:

14   **Q.      Mr. Garnett, would you turn to Exhibit B,**

15   **please?**

16                 MR. GILBERT:  B as in boy?

17                 MR. McLANDRICH:  Yes.  The

18   interrogatory responses.

19                         - - - -

20     (Thereupon, Defendants' Exhibit B was marked for

21                     identification.)

22                         - - - -

23   A.      I'm sorry.  Exhibit what now?

24   BY MR. McLANDRICH:

25   **Q.      B.**

1   A.      Okay.  Got it.

2   **Q.      Okay.  So interrogatory number one asks about**

3   **acts of retaliation that were taken against you for your**

4   **protected conduct, which is filing your OCRC charges or**

5   **complaining about discrimination or any of that.  I want**

6   **to know what acts of retaliation you suffered.**

7   A.      Nitpicking.

8   **Q.      What does that mean?**

9   A.      That means at one point the principal actually

10  put the assistant principal on me and it got to a point

11  where she started nitpicking my work like a spot on the

12  stage.

13  **Q.      Is this the sticky cupcake thing?**

14  A.      Yes.  Yes.  That incident.  There's another

15  incident that's in their paperwork with one of the

16  walkthroughs that they did where somebody found a strand

17  of hair under an iron fixture in the corner of the

18  bathroom.  That was part of it.

19  **Q.      Were you reprimanded for that in any fashion?**

20  A.      Well, it was a paper trail on me, which that was

21  another part of the retaliation, beginning a paper

22  trail.

23  **Q.      Is that sort of like recording conversations of**

24  **people, keeping a paper trail?**

25  A.      No.  It's not the same thing.

Page 136

1   Q.      How is it not?

2   A.      It's not the same thing because it's the intent.

3   My intent for recording was to protect myself.  These

4   guys by starting a paper trail were out to get me.

5   Q.      Or at least that's your interpretation of it?

6   A.      Yeah.  I'm not out to get anyone.  I'm just

7   trying to get the building clean and work.

8   Q.      Okay.  What other acts of retaliation?

9   A.      There was, of course, the downgrade.  I don't

10  even think she should have been allowed to downgrade me

11  because of all her comments.  We talked about comments

12  of black and white in 2016 but we never moved to 2017.

13  This stuff was still going on up until the time that I

14  left in 2017.

15  Q.      What does that mean?

16  A.      Well, trying to get Thomas Frame out of the

17  building, she said I wasn't the right custodian for him,

18  that he needed a white custodian.  Thomas Hill did --

19  that he would react better to a white custodian.

20  Q.      Did she say something about the different style

21  of discipline?  In your recording she said a stronger

22  style of discipline.

23  A.      I didn't record everything that was said.  She

24  said one thing in a meeting --

25              MR. GILBERT:  Who is the she you're

1  referring to?

2  A.      Tara Bruce.  Tara Bruce said a lot of things in

3  the meeting.  There are tapes that you had that she said

4  things, but there are other things that are not on tape.

5  BY MR. McLANDRICH:

6  Q.      **Now you're claiming that she said Thomas Hill**

7  **needed to be supervised by a white custodian?**

8  A.      I'm not claiming.  That's exactly what happened.

9  Q.      **Okay.  What else?**

10                MR. GILBERT:  When was that, though?

11  A.      During the time that I was trying to get him out

12  of the building, March, April.  Somewhere around that

13  time.

14  BY MR. McLANDRICH:

15  Q.      **What year?**

16  A.      2017.  But this stuff continued until the time

17  that I left.

18  Q.      **What's this stuff?**

19  A.      Black custodians, white things.  She would say

20  -- when I came back, because I was taking time off and

21  this Matt Bueser guy was replacing me, she told me that

22  she wanted him to be the head custodian.  She walked

23  away from me one time almost with a smile and I didn't

24  think it was funny, but she said she was going to

25  replace me with a white custodian.  This was the end of

1    2017.

2                        MR. GILBERT:  This is Bruce you're

3    talking about?

4    A.      Yes.  This is why the recording were started.

5    There were things like this being said all the time.

6    BY MR. McLANDRICH:

7    Q.      **What else?**

8    A.      That and the retaliation, how she felt with me

9    and black custodians I felt like that retaliation was

10   coming from -- she shouldn't really even have been the

11   one that gave me my grade.  There was retaliation by me

12   not having support when I asked for support or me being

13   the head custodian.  If I asked for the people's

14   schedules to be staggered rather than bring them in at

15   the same time, they wouldn't do it.  They wouldn't

16   reprimand the pool workers.  They were throwing away my

17   evals on them, the pool workers.  Tom Kekela wasn't

18   keeping that.  There was something else that popped in

19   my head and I forgot.  Hold on a second.

20   Q.      **What are you reading from, Mr. Garnett?**

21   A.      Notes that I wrote down.  Sometimes my memory --

22   do you want to see it?

23   Q.      **Sure.  Hold it up to the camera.**

24                        MR. GILBERT:  I have not seen that,

25   but you're referring to it?  Okay.  Counsel, you're

Page 139

1  entitled to see it.

2            MR. McLANDRICH:  It's certainly

3  covered by request of production of documents number

4  two.

5            MR. GILBERT:  I'm not arguing with

6  you.  I'm just saying whatever he's referring to, I've

7  not seen it.

8            MR. McLANDRICH:  Oh, okay.  I'm sorry

9  about that.

10           MR. GILBERT:  Whatever it is,

11  Mr. Garnett, you're going to have to produce it now.  I

12  don't know what it is.

13           MR. McLANDRICH:  Hold it up to the

14  screen a little longer so I could read what it says on

15  there.

16           MR. GILBERT:  I'm going to object to

17  that.  I think I'm going to need to see it before he

18  does that, but I agree.  I think your entitled to it but

19  for privilege.  Mr. Garnett, do you have the ability to

20  fax that or e-mail that to my office now?

21  A.     Yeah.  No, I don't.

22           MR. GILBERT:  Okay.  I want you to

23  stop referring to it right now.  Okay?  Stop reading it

24  and I'm going to need to see that at some point and get

25  it to Mr. McLandrich as well.  You're not supposed be

1  referring to a document that your counsel has not seen

2  during the course of a deposition.

3  A.      Oh, okay.  That's the first time that I picked

4  that up.

5  BY MR. McLANDRICH:

6  **Q.      Do you have notes other than that page that**

7  **you're looking at?**

8  A.      I probably have the same things that you have,

9  what you gave me.  What you gave me is what I have been

10  looking back and forth at.

11  **Q.      Okay.  So other than that one page, you don't**

12  **have any other notes?**

13  A.      No.

14  **Q.      So any other acts of retaliation that you**

15  **haven't told me about?**

16  A.      I'd have to go through it again.  I probably

17  missed something.  Like I said, not being supported,

18  pool workers not being taken out of the building.

19  Actually, let me see.

20              MR. GILBERT:  Just say whatever you

21  can remember at the present time.  If that's all you can

22  remember, that's okay.

23  A.      Okay.

24  BY MR. McLANDRICH:

25  **Q.      Do you claim you have a disability?**

Page 141

1   A.      Do I claim I have a disability?

2   Q.      **Yes.**

3   A.      The only thing that I can say to that is I'm on

4   disability.

5   Q.      **Okay.  Prior to going on disability did you ever**

6   **claim a disability to the district?**

7   A.      What do you mean?

8   Q.      **Sure.  Did you ever tell them I can't perform my**

9   **job or I need some assistance in performing my job**

10  **because I'm physically unable to do this, mentally**

11  **unable to do that?**

12                  MR. GILBERT:  Are you asking about

13  accommodations?

14                  MR. McLANDRICH:  Yeah.

15  A.      Yes.

16  BY MR. McLANDRICH:

17  Q.      **What did you ask for?  What accomodation did you**

18  **ask for?**

19  A.      Well, you should have that paperwork.  When I

20  went to Cleveland Clinic and they diagnosed me with PTSD

21  they had some kind of accommodations on that and I do

22  believe that Portage Path Behavioral Health had some

23  accommodations with being able to work three days and

24  having some time off.  I'd have to find that document.

25  Also one accomodation I made was to Matt Frame on

1    8-31-18.

2    Q.       What are you referring to?

3    A.       I told him I would like a transfer.

4    Q.       And you were on leave on 8-31-18, correct?

5    A.       Yes.

6    Q.       And you had your application for disability

7    benefit already pending, correct?

8    A.       Yes.  But I would have pulled that in a

9    heartbeat.

10   Q.       And you never came back to work, correct?

11   A.       They never got back in touch with me, no.

12   Q.       You never came back to work, correct?

13   A.       Todd Wammes told me not to come back on the

14   premises.

15   Q.       Wait a minute.  You proceeded with your

16   disability application, you received the disability

17   benefit and you never returned to work thereafter,

18   correct?

19                    MR. GILBERT:  Objection.  That's not

20   the way it went, counsel.

21                    MR. McLANDRICH:  Well, that's your

22   testimony.  Let's hear his.

23   A.       Okay.  Can I explain?  On 8-31 I was told to

24   turn into my keys, clean out my lockers and after all

25   that finding out that my stuff was stolen I had a

1  conversation with Matt Frame and told him I would like

2  to transfer out of this building.  After that I never

3  got a call.  This was August the 31st, so by time that

4  November came up, and it takes a while to get

5  disability, maybe a number of six to seven months, so it

6  was already in play.  When they never got back in touch

7  with me and then they come and they said the disability,

8  November the 15th I believe, that's when I felt I wasn't

9  coming back.  I felt that I was fired on 8-31-18.

10  BY MR. McLANDRICH:

11  **Q.      Did you ever get a document saying that you were**

12  **fired?**

13  A.      No.  But to be followed out of the building,

14  usually when somebody follows you around to collect your

15  things, collects your keys and told not to come to the

16  premise again, usually that means you're pretty much

17  fired.  I didn't know for sure.  That's why I told Matt

18  Frame I would like to transfer.

19  **Q.      And I assume under the union contract there's**

20  **mechanisms for transfers, right?**

21  A.      They raised my score which made me available for

22  a transfer.  If they didn't transfer me, I had no

23  building to go to.  I wasn't at Crouse any more to my

24  knowledge.

25  **Q.      So after you received the disability retirement**

1    did you ever have a reevaluation of your disability?

2    A.     I'm not sure.  I can't answer that.  A

3    reevaluation?  No.  I'm not sure.

4    Q.     Okay.  You've never received a finding that your

5    conditions for which you were deemed disability are such

6    that you're now no longer deemed disabled, have you?

7    A.     I was told that when I got the disability it

8    wasn't that I couldn't work.  It was never that I

9    couldn't work.

10   Q.     Okay.  Let's go to is Exhibit J, please?

11   A.     Okay.

12                        - - - -

13      (Thereupon, Defendants' Exhibit J was marked for

14                    identification.)

15                        - - - -

16   BY MR. McLANDRICH:

17   Q.     So if you would scroll back 12 pages and you'll

18   see a letter from The School Employees Retirement System

19   dated December 4th, 2018.

20   A.     Yes, sir.

21   Q.     Do you see that?

22   A.     What's the date?

23   Q.     December 4th, 2018?

24   A.     Yes.

25   Q.     I'm just going to read the last paragraph of

1    that letter into the record and then ask you about it.

2    "Please be advised that while you are receiving a

3    disability benefit you are prohibited from seeking

4    employment with any school system in any capacity.  If

5    you're receiving a disability benefit on a combined

6    basis with the Ohio Public Employees Retirement System,

7    you also are prohibited from seeking employment with any

8    public employer in the state of Ohio."

9            And so this letter, the first sentence advises

10   you as long as you're receiving that disability benefit

11   you can't seek employment with any school, right?

12   A.      Right.

13   Q.      So you were told that you couldn't work for a

14   school while you received disability benefit, correct?

15   A.      That wasn't my point.  My point was from August

16   to November nobody got in touch with me and it didn't

17   have to go to the disability.  I would have pulled that

18   out and told them no in a minute.

19   Q.      Okay.  Well, without them telling you anything

20   you could have puled it out, right?

21   A.      Right.  But I didn't have a job.  I didn't have

22   a school to go to.

23   Q.      You were still at Crouse?

24   A.      I really don't think that I was.  I was told not

25   to come on the premises again.

Page 146

1  Q.      Okay.  Go to the next page, please.  School

2  Employment Retirement System of Ohio dated November 1,

3  2018.  It should be the very next page.

4  A.      Yes.

5  Q.      Do you see the second paragraph it says "You

6  will be scheduled for reevaluation in approximately one

7  year."  Do you see that?

8  A.      Yes.

9  Q.      Did you have that reevaluation?

10 A.      I don't know if I did or didn't.  Let me think

11 for a second.  Now that reevaluation, if that means

12 they're continuing to pay me disability, then yes.

13 Q.      No.  That's not what it means, but let me see if

14 I can try to work through it with you.

15                 MR. GILBERT:  I'm going to object.

16                 MR. McLANDRICH:  Okay.  That's fine.

17                 MR. GILBERT:  Say what it means to

18 you, Mr. Garnett.  Don't try to be a doctor or anything

19 like that, just say what you think or just answer the

20 question, but don't try to give an opinion.  Okay?

21 A.      Okay.

22 BY MR. McLANDRICH:

23 Q.      So after you received your disability benefit

24 did SERS ever send you to another doctor?

25 A.      I can't answer that.

Page 147

1    Q.       Because you don't know?

2    A.       Right.  I've seen a lot of doctors.

3    Q.       I understand that.  As we sit here you've not

4    gotten any documents that you're aware of from SERS that

5    tells you that you're no longer disabled and you can

6    return to work, is that correct?

7    A.       I never got any paperwork saying that I couldn't

8    work.

9    Q.       Answer my question if you don't mind, though.

10   Do you ever recall receiving any documents from SERS

11   telling you that you were no longer disabled and free to

12   return to work?

13   A.       I'm trying to answer your question.  I'm not

14   trying to smart or disrespectful.  But the only way I

15   can answer that, why would I get a piece of paper saying

16   that I can work or I'm not longer disabled when I was

17   never told that I couldn't work.

18   Q.       If we go back to the previous page of Exhibit J

19   we already agreed that it says you're prohibited from

20   working as long as you're receiving the disability

21   benefit, correct?

22   A.       For Akron Public School.

23   Q.       And you continued to receive the disability

24   benefit, correct?

25                    MR. GILBERT:  Objection.

1    BY MR. McLANDRICH:

2    **Q.      Do you condition to receive a disability**

3    **benefit?**

4    A.      I think I know what you're asking me and what

5    you're saying, but I had answered that already when I

6    said it didn't have to get to this point.  From August

7    to November I didn't have a job.

8    **Q.      I appreciate that, but just answer my question**

9    **if you don't mind.  You continued to receive a**

10   **disability --**

11                  MR. GILBERT:  Counsel, he can work for

12   a private concern.  There's nothing here that -- you've

13   got to clear that question up.  There's nothing here

14   that prevents him from working for a private employer.

15                  MR. McLANDRICH:  I never suggested

16   that there is.  He can go work for anyone he wants other

17   than a school system in the state of Ohio.

18                  MR. GILBERT:  And that's what he's

19   telling you.

20                  MR. McLANDRICH:  He's not telling me

21   that at all.  Thank you for interpreting the testimony.

22                  MR. GILBERT:  He just said it.

23   BY MR. McLANDRICH:

24   **Q.      Mr. Garnett, yes or no, do you continue to**

25   **receive a disability benefit from SERS?**

Page 149

1   A.      Yes, I do.

2   Q.      **Let's go back to Exhibit B, Mr. Garnett.**

3   A.      Okay.  I got it.  Wait a minute.  I'm pushing on

4   it but it's not opening up.  Wait a minute.

5                   MR. GILBERT:  Counsel, perhaps you can

6   read the question and response.

7                   MR. McLANDRICH:  Don't worry about it.

8   We'll move on.

9   BY MR. McLANDRICH:

10  Q.      **Mr. Garnett, do you know whether the union**

11  **contract has a provision that speaks to transfers?**

12  A.      Possibly.  I'm pretty sure it does.

13  Q.      **And so if it does then that provision would**

14  **control the terms and circumstances under which a**

15  **transfer would occur, correct?**

16                  MR. GILBERT:  Objection.  Don't

17  speculate or guess on that.

18  A.      I don't know.

19                  MR. McLANDRICH:  These continuing

20  instruction are highly improper.

21                  MR. GILBERT:  I disagree.  You ask him

22  questions that -- he doesn't know anything about the

23  contract.  If he does he can say it.

24                  MR. McLANDRICH:  He doesn't need you

25  to constantly remind him.  It's highly improper.

Page 150

```
 1                    MR. GILBERT:  He's not required to
 2    answer questions that he's not familiar with.
 3                    MR. McLANDRICH:  You need to read the
 4    local rule on depositions again, Ed, and I'm losing my
 5    patience.
 6                    MR. GILBERT:  I just lost my patience
 7    because I think you're being unfair about that.
 8                    MR. McLANDRICH:  Okay.
 9    A.      To be honest with you --
10                    MR. GILBERT:  Wait on a question.
11    A.      Okay.
12    BY MR. McLANDRICH:
13    Q.      Did you request the SERS folks to give you a
14    reevaluation?  Did you ever request one?
15    A.      My wife was -- I was in such bad shape my wife
16    was taking care of all the paperwork at that time.  I
17    can't answer that.
18    Q.      I'm talking about since they awarded you a
19    disability benefit.
20    A.      I can't answer that.
21                    MR. GILBERT:  You mean that you don't
22    know?
23    A.      Yeah.  I don't know.  Sorry.
24                    MR. McLANDRICH:  I should just take
25    your deposition.
```

Page 151

1              MR. GILBERT:  We're answering the

2     questions, counsel.

3     BY MR. McLANDRICH:

4     Q.      **Tell me about any statements that anyone made to**

5     **you that suggests that you were being discriminated**

6     **against based on your age?**

7     A.      I was constantly been told that I was slow.

8     Q.      **By who?**

9     A.      Tara Bruce.

10    Q.      **Okay.  To you that translated to age?**

11    A.      Yes.

12    Q.      **All right.  Go ahead.  Anything else?**

13    A.      Constantly asking me how old I am.

14    Q.      **Who did?**

15    A.      Tara Bruce.

16    Q.      **What else?**

17    A.      Constantly tell me that she would work circles

18    around me.

19    Q.      **Anything else?**

20    A.      She said that younger white custodians work

21    faster and better.

22    Q.      **Are those the words that she used?**

23    A.      Yes.

24    Q.      **Anything else she said?**

25    A.      Let me think.  Those were the things that

1  happened all the time.  As far as what I can remember at

2  this point.

3  Q.      That's all you can testify to.

4  A.      I'm trying to think.  I'm trying to remember.

5  That's as far as I can remember right now.

6  Q.      Any comments by anyone else about your age?

7  A.      Matt Frame asked me how old I was one time.

8  Q.      Anything else by Matt Frame?

9  A.      As far as age, that was it.

10 Q.      What was the context in which he asked you how

11 old you were?

12 A.      He just came out and asked me like Ms. Bruce

13 did.

14 Q.      No other conversation that you recall before or

15 after that specific question?

16 A.      It was just like Ms. Bruce used to do right out

17 of the clear blue sky.  How old are you, Mr. Garnett?

18 Q.      Okay.  Anybody ever make any statements to you

19 about your disability?

20 A.      Me and Matt Frame talked about PTSD.

21 Q.      Okay.  Other than that?

22 A.      Not that I can recall, no.

23 Q.      Has your physical condition improved or gotten

24 worse since you left the school on August 31st, 2018?

25 A.      Probably a little worse but pretty close to back

Page 153

1    to where I was.  I'm close.

2    Q.      Which conditions in your view have gotten worse?

3    A.      After I got hit in the back of the head my eyes,

4    that's when I started really struggling with my eyes.

5    My eyes are a little worse.  Other than that, that's

6    pretty much it.  I might get a little more winded than I

7    used to, but it's not a big deal.

8    Q.      How long does it take when you have to go for

9    dialysis when you go -- is it three times a week?

10   A.      Yes.  Three times a week.

11   Q.      What days do you go?

12   A.      Monday, Wednesday and Friday.

13   Q.      How long does that take?

14   A.      Three hours and 15 minutes and they got --

15   sorry.

16   Q.      Have they told you how long you could remain on

17   dialysis?

18   A.      No.  They didn't tell me how long.

19   Q.      Do you have any facts to cite to me to support a

20   claim that Matt Frame and Tara Bruce conspired regarding

21   this reduced evaluation?

22   A.      Say that again.

23   Q.      Sure.  Do you have any facts to support the

24   claim that Matt Frame and Tara Bruce conspired to give

25   you a poor evaluation?

1   A.      Sure.  By not replacing the people that weren't

2   doing their job.  If they would have replaced the people

3   with someone who was doing their job -- they were

4   actually holding what other people did against me.

5   Q.      Anything beyond that?

6   A.      I know Matt Frame came through and did I believe

7   sometime in March a big building inspection, which ended

8   up in my eval meeting, so it was beginning a paper trail

9   with walkthroughs, building checks and different things

10  like that.  But, again, I would say there was no reason

11  for me to be downgraded because I've never been written

12  up or had a verbal warning.

13  Q.      And when you say that the walkthrough ended up

14  in your eval, what does that mean?

15  A.      What Matt Frame -- it wasn't in the meeting at

16  first.  There was nothing really in the meeting at first

17  in that first downgrade evaluation except four

18  paragraphs.  That Matt Frame building check that he did

19  in March came later.  Thank you for reminding me.  That

20  came later after the evaluation was all over and after I

21  talked to John Beverlin and said, hey, she can't

22  downgrade me because I've never had a verbal or written

23  warning.  That's when Matt Frame's paperwork popped up

24  and other things started to pop up.

25  Q.      So you've never a received a verbal warning or

1    **written warning?**

2    A.       Yes.

3    **Q.       Yes, you've never received one?**

4    A.       I've never received a verbal or written warning.

5    **Q.       Okay.  And the walkthrough didn't result in any**

6    **sort of disciplinary action against you, correct?**

7    A.       It was starting a paper trail.

8    **Q.       And it never resulted in any disciplinary action**

9    **against you, correct?**

10   A.       No.  No.

11   **Q.       Are you contending that your building is the**

12   **only one that's ever had a walkthrough?**

13   A.       No.  Again, we have to speak of the intent of a

14   thing.  The intent was totally different.

15   **Q.       How do you know that?**

16   A.       It was to set me up.

17   **Q.       How do you know that?**

18   A.       That I know because all of a sudden, as a matter

19   of fact, when Matt Frame came out to the building my

20   understanding of what was told to me was that he was

21   going to show them how to do it or something along those

22   lines with a paper trail.  He started the paper trial

23   and Ms. Bruce started the paper trail.

24   **Q.       I'm sorry.  Tell me what Frame said?**

25   A.       It was hearsay that he was going to show how

1    this is done and that came from all the things that he

2    wrote down on that building check, all the pictures that

3    was taken on that building check and he also came out to

4    the building at the time that the building should still

5    have had people working, but there was nobody working at

6    that time.

7    **Q.      And what is this, when you say how this is done?**

8    A.      Well, I guess a paper trail to get me demoted or

9    fired.

10   **Q.      So when you say show how this is done, show how**

11   **to get you demoted or fired.  Is that what you're**

12   **saying?**

13   A.      Exactly.

14   **Q.      When you say this is hearsay who did you hear**

15   **this from?**

16   A.      The pool workers who were there.

17   **Q.      What do you mean?  I thought you said no one was**

18   **there during the walkthrough?**

19   A.      I guess they came back and talked to Matt Frame.

20   **Q.      Which pool workers are we talking about?**

21   A.      Like I said, I don't know which pool worker it

22   was but Matt Frame said he was in the building by

23   himself but I don't know how they heard it.

24   **Q.      What pool workers did you hear it from?**

25   A.      The same pool workers that Matt Frame -- it

1  would have had to have been from Thomas Hill because at

2  the same time Matt Frame would pat them on the shoulders

3  even though the building was a mess saying they were

4  doing a good job.  That would have been Thomas Hill.

5  **Q.      Do you have a specific memory that it was Thomas**

6  **Hill that told you this?**

7  A.      Yes.

8  **Q.      What else did Matt Frame do, if anything?**

9  A.      He came through the building taking pictures.

10 He put that in my file after I explained to John

11 Beverlin what the principal couldn't do, so he started

12 padding my files.

13 **Q.      Isn't that Matt Frame's job to do a walkthrough**

14 **when he's asked?**

15 A.      We're talking about my files being padded.

16 **Q.      You're talking about the walkthrough being put**

17 **in your file?**

18 A.      Exactly.  But it wasn't part of the evaluation.

19 Like I said earlier, when I had the evaluation the only

20 thing that I had on that evaluation was four paragraphs.

21 I called John Beverlin, told him the situation and how I

22 felt that I never had a verbal or written warning and

23 then all of a sudden that popped up.  That's different

24 from a walkthrough than all of a sudden paperwork

25 popping up to try to justify something.

1    Q.        Anything else for Matt Frame?

2    A.        I just remember me and him having a conversation

3    in the office about the hangman noose situation and he

4    didn't seem to happy about that.  That was in 2017.

5    Q.        And that you took from the look on his face?

6    A.        Well, that was from no response.  We've had

7    other conversations about that, but at this time it was

8    a little different.

9    Q.        What does that mean?

10   A.        Like I said, it was more cold, distant.  Can I

11   back up with one statement?

12                    MR. GILBERT:  You have to correct or

13   add to something?

14   A.        Yeah.  I wanted to correct something.  When it

15   comes to where I heard that from it could have been

16   Thomas Hill or it could have been from Donnelle McNary.

17   I apologize for pointing that situation out to just one

18   person because I really wasn't sure and I'm still not

19   absolutely sure.

20   BY MR. McLANDRICH:

21   Q.        But Donnelle was not a pool worker?

22   A.        No.  Donnelle was an eight-hour custodial

23   worker.

24   Q.        So it wasn't necessarily a pool worker you heard

25   it from?

Page 159

1  A.      It could have been a pool worker, or it could

2  have been Donnelle McNary.  I can't remember.  I just

3  remember what was said.

4  **Q.      So prior to the time that you had left the**

5  **building in August of 2018 there was no physical**

6  **conditions or mental conditions that prohibited you from**

7  **being able to do your job, right?**

8              MR. GILBERT:  Could you say that

9  question again, please?

10  BY MR. McLANDRICH:

11  **Q.      Sure.  Prior to the time that you left the**

12  **building in August of 2018 there was no physical or**

13  **mental conditions that you had that prevented you from**

14  **being able to do your job?**

15  A.      No, there wasn't.  If I could have been

16  transferred to another building I could have started in

17  September.

18  **Q.      And the only thing in your mind that gave you a**

19  **problem of doing your job was the fact that the pool**

20  **workers that you got weren't working properly?**

21              MR. GILBERT:  Objection.

22  A.      Say it again.

23  BY MR. McLANDRICH:

24  **Q.      Sure.  The only problem that you had in**

25  **performing the actual tasks of your job was that you**

1   **felt that the pool workers that you had didn't do their**

2   **jobs properly?**

3   A.      When you're saying my job, are you talking about

4   what I did as a custodian from seven to three.

5   **Q.      Let me ask it over to clear up any confusion.**

6   **With respect to the performance of the custodial**

7   **services in the building and your responsibility to make**

8   **sure that the building was clean, the only thing that**

9   **prevented you from having a clean building was that your**

10  **subordinate custodians didn't do a good enough job?**

11  A.      Absolutely not.

12                  MR. GILBERT:  Objection.

13  A.      It was a combination of Matt Frame and Tara

14  Bruce.

15  BY MR. McLANDRICH:

16  **Q.      And what did they do that prevented --**

17                  MR. GILBERT:  Let him finish his

18  answer.

19  A.      It was a combination between Tara Bruce, Matt

20  Frame, John Beverlin and Tom Kekela.

21  BY MR. McLANDRICH:

22  **Q.      And what did they do that prevented you from**

23  **having a clean building?**

24  A.      Again, I wasn't supported as a head custodian.

25  I was just a body.  I had no power.  Everything I did --

1    as a matter of fact, when I finally figured out

2    something because I had to change people's schedules,

3    trying to do everything to get this building to work, I

4    took numerous pictures, e-mailed plenty of people and

5    when I finally got this thing to work and put Thomas

6    Hill in a situation where he wasn't hiding women in

7    bathrooms and talking too much, after I got the

8    situation corrected, the next day John Beverlin come out

9    to the building and said I don't want it done like that.

10   I also shared with Bruce, if you're the building manager

11   why is Mr. Beverlin coming out here now saying that

12   after something that worked, a work schedules that I

13   worked, why is he coming out to the building saying he

14   don't want it done like that.  I thought you were the

15   building manager.

16   **Q.      And that had to do with Thomas Hill going**

17   **upstairs to help Ms. McNary with the second floor as**

18   **opposed to staying on the first floor, right?**

19   A.      I don't think so.  I think this had something to

20   do with me -- I don't know if that was the situation,

21   but it has something --

22   **Q.      That's what the recording I listened to --**

23              MR. GILBERT:  Objection.  Let him

24   finish his answer.

25   A.      I don't know.  I'd have to listen to that

1  recording, but just because something is recorded and

2  something sounds familiar in my answer doesn't mean it's

3  the same situation.  What I'm trying to explain to you

4  is if it's in the recording you can reference that, but

5  I freed Donnelle McNary up for two hours so she could go

6  around the building and help these people out, check

7  their run because they talk about responsibility time,

8  but Ms. McNary just because she was paid responsibility

9  time, she struggles getting her run done.  So I freed

10  her up to make sure that everybody was doing their job,

11  and that night was a good night.  The very next day

12  Mr. Beverlin came and told us we couldn't do it like

13  that.

14  BY MS. McLANDRICH:

15  **Q.      And when he tells you that he doesn't want it**

16  **done like that, assuming that's what he said, what is**

17  **that evidence of?**

18  A.      That they didn't want the building clean.

19  That's another point.  I got to a point where I could

20  tell Ms. Bruce didn't want the building clean,

21  management didn't want the building clean, because as

22  long as the building is not clean, then all that falls

23  on me, which soon gets me out of the building, demoted

24  or fired.  Nobody wanted that building clean except for

25  me.

1  Q.      All right.  And so back to my question, which

2  was the only thing that prevented the building from

3  being clean is the fact that the co-workers weren't

4  helping you enough, right, because you couldn't do it

5  all by yourself?

6                    MR. GILBERT:  Objection.

7  A.     I apologize, but I thought I just answered that

8  when I said that was Matt Frame and Tara Bruce also.

9  BY MR. McLANDRICH:

10  Q.      But they're not going to come out and clean the

11  building?

12                    MR. GILBERT:  Objection.  Argumentive.

13  A.     But they prevented it from being cleaned.  When

14  I would leave at night Tara Bruce was giving the pool

15  workers other assignments just like they did with Trevor

16  Schrom.  She was telling my pool workers what to do

17  while I was gone.  I left at three.

18  BY MR. McLANDRICH:

19  Q.      But in terms of the work that you actually

20  performed you were able to do all of your work that you

21  were physically supposed to do, right?

22  A.     And you're talking about me now from seven to

23  three.

24  Q.      I'm talking about you from seven to three.

25  A.     No.  I couldn't complete -- there were some days

1   that I couldn't complete my work.

2   **Q.        What stopped you from being able to do that?**

3   A.        Okay.  I didn't have an assistant.  I'd come in

4   in the morning -- okay.  For example, let me give you

5   one day.  For example, we would have Project Ujima come

6   up to the building and when they come up to the building

7   they need the cafeteria, all the tables moved out to the

8   side, and maybe about 30 to 40 tables in the center of

9   the cafeteria floor.  When I was an assistant that's

10  what I did.  Now that I was a head custodian, that's

11  what I did.  So I would set that up and when I would go

12  home, Project Ujima would be there sometimes past 8:30.

13  Now I have no pool workers in the building.  They're

14  still using the bathrooms, the cafeterias is not put

15  back together.  So when I come back in in the morning

16  that's not on my schedule to put the cafeteria back

17  together, so that adds to me starting off being behind.

18        So now I have to put the cafeteria together.

19  Now I have six or seven rooms that haven't been touched.

20  Now I have to go and clean these rooms, empty trash

21  cans, and clean bathrooms that should have been done the

22  night before.  I still have to pick up paper outside,

23  still shovelling duck poop off the playground area and

24  the basketball area and then I could try to come in and

25  start my job.  When I came in to start my job, Ms. Bruce

1   was always having anywhere from 30 to 45 minute

2   conversations with me or she's calling me or telling me

3   to do something, trying to get the music room taken care

4   of.  Something that I could have delegated that

5   responsibility to a pool workers since the permit wasn't

6   until the next day.  Ms. Bruce, let me let the pool

7   workers do this.  She told me, no, I want it done before

8   you leave.  If I do this and fix this music room up, I'm

9   not going to be able to complete the cafeteria seeing

10  that nobody wants me to work overtime because I use to

11  do work a lot of free overtime in my building.  The

12  minute I can't get my cafeteria done Bruce gets on the

13  phone after all that and the next thing I know Matt

14  Frame is out at the building.  That was just one day.

15  Most of the days I had to come in and clean rooms.

16  **Q.      The reason that you had to clean rooms is**

17  **because one of the other custodians, whether it's a pool**

18  **worker, assistant or eight-hour worker, they were**

19  **supposed to clean those rooms already?**

20  A.      Yes.  They're supposed to do that work at night.

21  **Q.      All right.  But in terms of you being able to**

22  **physically perform the tasks that were on your schedule**

23  **you were able to do those?**

24              MR. GILBERT:  Objection.

25  BY MR. McLANDRICH:

Page 166

1    Q.       You were physical ability to do them?

2               MR. GILBERT:  Objection.

3    A.       I thought I just answered that.  I don't

4    understand what you're asking me.

5    BY MR. McLANDRICH:

6    Q.       Let me try to clarify it.  There's a difference

7    between having enough time to do something and being

8    physically able to do it.  Do you understand the

9    difference?

10   A.       Yes.  Yes.

11   Q.       All right.  So you could sweep and mop the

12   cafeteria, correct?

13   A.       Yes.

14   Q.       And you could turn on the lights and make sure

15   that boiler is working, right?

16   A.       Yes.

17   Q.       And you could go outside and you could pick up

18   paper, right?

19   A.       Right.

20   Q.       And you could ride the lawnmower if you had to,

21   right?

22   A.       Yes.

23   Q.       And you could shovel the duck poop if the duck

24   poop needed to be shoveled or the snow off the walk if

25   that needed to be done, correct?

1    A.      Yes.

2    Q.      So when you would come in in the morning you

3    would open the main office door and the copy room door

4    and open the doors to the kitchen, correct?

5    A.      Yes.  Depending on which way I came into the

6    building.

7    Q.      And those are things that you were capable of

8    doing?

9    A.      Yes.

10   Q.      And then you would double bag the trash cans for

11   breakfast and take some cans upstairs to the second

12   floor, correct?

13   A.      On a normal day.  Yes.

14   Q.      And you were physically able to do that,

15   correct?

16   A.      Yes.  On a normal day.

17   Q.      Right.  And when you're saying, "on a normal

18   day," that means if you were pulled off onto something

19   else or somebody else hadn't taken care of something

20   else you might go do that instead?

21   A.      No.  A normal day would be a head custodian in

22   that building, an assistant custodian in that building

23   and an eight-hour person in that building.

24   Q.      All right.  And than you would go to the second

25   floor, open up the copy room, right, on a normal day?

1  A.      I understand you're probably reading from my

2  open procedure.

3  **Q.      Yeah.**

4  A.      Okay.  If you're asking if things goes that way

5  just because they're on paper, no.  Things don't happen

6  that way.

7  **Q.      That's not what I'm asking at all.  I'm just ask**

8  **whether you're --**

9                      MR. GILBERT:  Objection.

10                     MR. McLANDRICH:  I'm answering his

11 question.

12 BY MR. McLANDRICH:

13 **Q.      I'm asking whether you were able to perform**

14 **these task if you had the opportunity to perform them.**

15                     MR. GILBERT:  At what point in time,

16 counsel?

17 A.      Oh, yeah.

18                     MR. McLANDRICH:  When he left the

19 building in August.

20                     MR. GILBERT:  Now we have the

21 timeframe of August of 2018, correct?

22 BY MR. McLANDRICH:

23 **Q.      Or any other time.  Was there a time where you**

24 **were physically unable to mop a floor, you couldn't move**

25 **the mop with your arms?**

Page 169

```
 1    A.       No.

 2    Q.       Was there a time that you physically couldn't

 3    use the broom?

 4    A.       No.

 5    Q.       Was there a time that you couldn't physically

 6    put a bag into a trash can and move the trash can?

 7    A.       No.

 8    Q.       Was there a time that you couldn't physically

 9    operate the boiler?

10    A.       No.

11    Q.       Was there a time where you physically couldn't

12    walk up and down the steps in the building?

13    A.       No.

14    Q.       Was there a time where you couldn't empty the

15    trash cans after breakfast?

16    A.       No.

17    Q.       Was there a time where you couldn't open and

18    close the doors to the various offices?

19                      MR. GILBERT:  Let him answer your

20    question.

21                      MR. McLANDRICH:  I did.  He said no.

22    A.       Ask the question again.

23                      MR. GILBERT:  You cut him off.

24                      MR. McLANDRICH:  It certainly not was

25    not my intention.
```

1    BY MR. McLANDRICH:

2    Q.      Was there ever a time that you couldn't empty a

3    trash can?

4    A.      Not physically, no.

5    Q.      All right.  Was there ever a time that you

6    couldn't physically operate the boiler?

7    A.      No.  Not physically.

8    Q.      Was there ever a time where you couldn't move

9    the tables around in the cafeteria?

10   A.      No.  Not physically.

11   Q.      And when you say "no, not physically," are

12   suggesting there was a time that you didn't have enough

13   time to do those things?

14   A.      Exactly.

15   Q.      Okay.  And I understood that.  Thank you.  And

16   there was never a time that you couldn't physically open

17   and close the doors to the various rooms and unlock the

18   building and lock the building back up if you needed to?

19   A.      No.

20   Q.      Was there anything that physically prevented you

21   from being able to observe the quantity and quality of

22   the work performed by the other custodians?

23   A.      No.

24   Q.      And as head custodian you were sort of captain

25   of the ship of the custodial services in that building,

Page 171

1    **correct?**

2    A.      Yes.  If you'd like to put that it day way.

3    Q.      **And it was your duty to supervisor the other**

4    **custodians and ensure that the building was clean,**

5    **correct?**

6    A.      Along with an assistant custodian if I had one.

7    If I had an assistant, that would have been different.

8    Q.      **And an assistant custodian would have made the**

9    **job easier to perform?**

10   A.      Yes.  If I had somebody to watch the people to

11   make sure that the work was being done, yes.

12                    MR. McLANDRICH:  All right.  Let's

13   take a ten minute break.

14                    MR. GILBERT:  Counsel, do you know how

15   many longer you'll be?

16                    MR. McLANDRICH:  I'm close to done.

17                         - - - -

18   (Thereupon, an off-the-record discussion was held.)

19                         - - - -

20   BY MR. McLANDRICH:

21   Q.      **Mr. Garnett, which of the pool workers that you**

22   **had -- you weren't really there in '18 at all, were you?**

23   A.      No.

24   Q.      **So when you have left in '18 you hadn't been in**

25   **the building for at least those eight months of '18,**

Page 172

1    correct?

2    A.      Yes.

3    Q.      **Yes, that's correct?**

4    A.      Yes.  I do believe that's correct.

5    Q.      **So then let's just talk about 2017.  Which pool**

6    **workers did you have during 2017 that were good?**

7    A.      '17, Mikal.  I don't know his last name.  I

8    think Mikal is his first name.

9    Q.      **That's M-I-K-A-L?**

10   A.      Yes.

11   Q.      **Okay.**

12   A.      If you have a list of those that worked there I

13   could tell you who was good or bad.  Mikal and Thomas

14   Hill is pretty much all I could remember.

15   Q.      **Was Thomas Hill good or bad?**

16   A.      Thomas Hill was good in the beginning.  I

17   believe Thomas Hill came and I had an assistant at the

18   time.  I believe Thomas Hill came in January and things

19   in the beginning seemed to be working out.

20   Q.      **How about Ms. McNary, I know she wasn't a pool**

21   **worker, but was she a good worker?**

22   A.      As far as the workload she had, yes.  She was a

23   good worker.

24   Q.      **And she was an eight-hour worker, right?**

25   A.      Eight-hour custodial, yes.

1   Q.      How about Trevor Schrom, was he a decent worker?

2   A.      Actually, no.

3   Q.      Who else was a bad pool worker?

4   A.      Like I said, Allen Wallace.  He wasn't trained.

5   I forgot about him.

6   Q.      And was he capable of doing the work just not

7   well trained?

8   A.      I don't know if he was capable of doing the work

9   or not.  Like I said, we get some of these pool workers

10  who have disabilities and sometimes you could show them

11  something and they'll forget in two days.

12  Q.      And Mr. Ache we already decided was a good pool

13  worker, right?

14  A.      Yes.  He did his job.

15  Q.      And do you recall what time period he was with

16  you?

17  A.      I think it was at the end of the year possibly

18  the last month in May.

19  Q.      Of '17?

20  A.      Possibly.  From the best of my memory I think it

21  was at the end of May.

22  Q.      May of '17?

23  A.      Yes.

24  Q.      And then he stayed how long, do you know?

25  A.      After that month and the school shut down I

Page 174

1   believe they took him out of the building.

2   Q.      Okay.

3                   MR. GILBERT:  Counsel, you made a

4   statement that I'm not sure is accurate.  I want to

5   clear it up with you.  Mr. Garnett was not in the

6   building in 2018.  That could be right.

7                   MR. McLANDRICH:  It wasn't a

8   statement.  It was a question.

9   A.      Yeah.  I don't believe I was.  I don't know.

10                  MR. GILBERT:  Okay.

11  BY MR. McLANDRICH:

12  Q.      Was there a pool worker name David?

13  A.      Oh, yes.  David Jones.

14  Q.      David Jones, was he good or bad?

15  A.      David Jones was a good pool worker.

16  Q.      When was he with you?

17  A.      I can't remember.  I know I requested for him to

18  come back to replace Thomas Hill.  I don't know if it

19  was -- let me take that back.  I did request for him to

20  come to my building and I believe that was in 2017.

21  Q.      Who was the guy that you had the shouting match

22  with, was that Thomas Hill?

23  A.      I never had a shouting match with anybody.

24  Q.      Who was the guy that shouted at you?

25  A.      Thomas Hill.

Page 175

1   Q.      So that's the same guy?

2   A.      Yes.

3   Q.      Okay.  And then there was a guy that was

4   referred to somewhere as younger Thomas or something.

5   Who was that guy?

6   A.      We called him Tea Time.  He was a student.  I

7   don't know his last name.

8   Q.      So he was just a student helper?

9   A.      Yes.

10  Q.      No other pool workers that you worked with that

11  you can remember?

12  A.      Are you talking about during that time?

13  Q.      Yes.

14  A.      Sam Page.

15  Q.      And how was he, good or bad?

16  A.      Bad.

17  Q.      And was he just lazy and wouldn't do his work

18  kind of thing?

19  A.      Yes.  I also took pictures of his work and I had

20  went in on a Saturday and found his run was about five

21  or six rooms up on the second floor that weren't

22  complete.  It was feces across from the pre-kids room on

23  a Saturday.  I had called and complained about that.

24  Q.      So in terms of damages in this case,

25  Mr. Garnett, do you know what you're claiming in terms

1  of damages?

2  A.      What do you mean?  I don't know what you mean.

3  Q.      **Yeah.  So I know like a damage would be you**

4  **think that you should get paid for your drill and**

5  **battery charger and now these items of clothing that you**

6  **believe were in the lockers, right?  So that would be a**

7  **damage.**

8  A.      Okay.

9  Q.      **So we've got those items, if you will.**

10  A.      Yes.

11  Q.      **And then it sounds like you think that you**

12  **should still be working at APS?**

13  A.      Is that a question?

14  Q.      **Is that one of the things that you're claiming**

15  **that you should still be there?**

16  A.      I don't know how to answer that.  I really don't

17  know how to answer that.

18  Q.      **Okay.  Well, are you --**

19  A.      I do know how to answer that now.  I feel -- let

20  me go back.  I'm not sure how to answer that question.

21  Q.      **Okay.**

22  A.      Am I capable to work at APS?

23  Q.      **We can start with that.**

24  A.      Yes.

25  Q.      **Have you had any sort of occupational evaluation**

1  **by any of your doctors to see what you're physically**

2  **able to do?**

3  A.      Well, I had spoke with my dialysis doctor and he

4  had put forth some reasonable accommodations.

5  **Q.      I'm not sure what that means.**

6  A.      He was saying you might need some extra breaks,

7  a computer screen, something reasonable.  Not turning

8  the Board of Education upsidedown but just simple

9  things, reasonable.  I might need a couple days off here

10  and there for certain things.

11  **Q.      Okay.  Well, right now it sounds like from what**

12  **you said earlier you need at least three-and-a-half**

13  **hours three times a week off to go to dialysis, right?**

14  A.      Yes.

15  **Q.      Well, you need that.**

16  A.      Well, actually the hours of dialysis, you could

17  in as early at 5:30 in the morning or as late as 4:00.

18  **Q.      Okay.  So maybe you could go after the workday?**

19  A.      Exactly.

20  **Q.      Are you asking the court to give you your job**

21  **back?**

22  A.      I'm just here doing a deposition.

23  **Q.      I understand, but I'm trying to understand in**

24  **the deposition what relief you would have the court**

25  **grant you if they gave you everything that you wanted.**

1   **Would that include going back to work at APS?**

2   A.      I never thought about it.  I don't know how to

3   answer that question.

4   **Q.      Okay.  So if you don't know, you don't know and**

5   **that's fine.  You don't know if whether part of what**

6   **you're asking the court to reward you is your job back?**

7   A.      Well, if that's in there.  If it's in there I'm

8   fine with it.  If that's part of it.  Are you talking

9   real or you just throwing that out there just to see

10  what I say?

11  **Q.      Well --**

12  A.      I don't mean to be asking you questions, I just

13  was never expecting that question.

14  **Q.      Sure.  And the reality of this is, this is your**

15  **lawsuit.  So what you think you're entitled to is what**

16  **you think you're entitled to.  I'm just trying to figure**

17  **out what you think it is.  Mr. Gilbert might think it's**

18  **one thing and I'm just asking Mark Garnett, what is it**

19  **that you want out of this lawsuit?**

20  A.      I can't answer that.  That would have to be

21  something I guess that I would have to think about.

22  That would be something that I would have to think

23  about.  If you ask me that question right out to the

24  clear blue without any thought amongst other people.  I

25  don't want to just throw an answer out there to you.

1              MR. GILBERT:  You've answered the

2    question.

3    BY MR. McLANDRICH:

4    **Q.     So, we don't know about return to work.  We know**

5    **that you want to be paid for your personal items that**

6    **you believe were stolen from you.  I get that.  What**

7    **else is it that you think you ought to be compensated**

8    **for because of what people have done to you?  What do**

9    **you think you're entitled to?**

10             MR. GILBERT:  I'm going to object,

11   counsel.

12             MR. McLANDRICH:  I understand.

13   A.     Are you talking about money?

14   BY MR. McLANDRICH:

15   **Q.     Yeah.  What do you think that you should be**

16   **given money for?**

17   A.     Money has never been on my mind.  Change.  I

18   don't want people to have to go to work and be chased

19   down the hallway with hangman nooses and be conspired

20   against and treated badly.  That's my stand.  What I

21   want is for things to change and for a light to be

22   shined on things where it makes things better for

23   everybody.  I've never thought about money ever.

24   **Q.     Let's just take those statements at face value,**

25   **if you will.  So, no one has displayed hangman's noose**

Page 180

1  since 2002, so that doesn't seem to be something that

2  needs to be changed, am I right?

3  A.      Let me explain that.  I may not have physically

4  seen a noose since '02, but I see it in my nightmares.

5  I still have nightmares.  What I'm saying is that I

6  still have nightmares.  When you're saying I haven't

7  seen them, I have seen them.  My thing is hopefully I

8  could make a difference to even where just one person

9  doesn't have to see hangman nooses in their dreams.

10  Q.      And I get that and my heart goes out to you that

11  you still see them and I don't want you to see them and

12  I don't want you to suffer that.  But with that said, in

13  terms of effecting change, I can't stop you from seeing

14  them in your dreams.  If I could, believe me I would do

15  that.  But what I'm trying to understand is, you know,

16  this is a civil lawsuit.  Civil lawsuits are about money

17  and, you know, no one wants you to continue to suffer

18  that but now here we are in a civil lawsuit which is a

19  case to recover money.  So you know, are you asking the

20  court or asking a jury to pay you because you have bad

21  dreams still?

22                  MR. GILBERT:  Objection, counsel.  You

23  have the complaint before you.

24                  MR. McLANDRICH:  I know I have the

25  complaint.  I'm taking the witness' deposition.

1  A.      If I could take all of that stuff away and still

2  be making a good salary, because I made a great salary

3  while I was working for APS, but if you're asking about

4  money, there's no amount of money that can fix me.

5  There's no amount of money that's going to put a smile

6  on my face.  If you're asking me about money there's no

7  limit to anything that's going to make me happy.  Again,

8  I'd like to say it's not about money but there's no

9  amount of money that can fix me.

10  BY MR. McLANDRICH:

11  **Q.      And I get that.  So now with that said, this is**

12  **still a civil lawsuit.  So what are you asking the court**

13  **to pay you for?  Is it for the bad dreams?  Is it for**

14  **what happened in 2002, or is it because you had the**

15  **lousy pool workers?  What are you asking to be paid for?**

16              MR. GILBERT:  Objection.

17  A.      I wish I knew how to answer your question.  I've

18  never thought about money.

19  BY MR. McLANDRICH:

20  **Q.      I'm not asking you for a specific amount of**

21  **money.  I'm looking for items or categories where you**

22  **think that you've been injured that somebody would**

23  **conceivably pay you for.  If you were saying they broke**

24  **my leg, I could understand that.  Now I'm trying to**

25  **understand what it is that at the end of the day you're**

Page 182

1    **lawyer is going to stand up and say pay this man for it.**
2    **I don't get to ask him.  I can ask him any time.  I'm**
3    **asking you.**
4                    MR. GILBERT:  Objection.  I think he's
5    answered the question.
6                    MR. McLANDRICH:  I appreciate your
7    objection.
8                    MR. GILBERT:  Go ahead.
9    A.     Okay.  The only thing -- I don't know what it's
10   worth.  I don't know what six guys coming up to you in a
11   classroom saying we about to have a lynching and they're
12   about to put a rope around your neck, then you have a
13   confrontation with them and they look at you and you
14   take off down the hallway and they're following you down
15   the hallway and you end up in a classroom, hiding out in
16   a classroom.  I don't know what that's worth.  I don't
17   know what it's worth to be transferred to a building
18   where there's still ties to this building.  I don't know
19   what it's worth for me to see this guy's face at Crouse
20   again a couple of times.  I don't know what it's worth
21   to go to work and be paranoid.  How do you put a price
22   on that?  Have I answered your question again?  If you
23   want another answer from me I don't have anymore.
24                    MR. GILBERT:  You've answered the
25   question.  Thank you.

1   BY MR. McLANDRICH:

2   **Q.      Do you have any physical injuries that you're**

3   **looking to recover from?**

4   A.      You're asking about the hit up side the head?

5   **Q.      I'm asking if you in your own mind you believe**

6   **that you have physical injuries that you're looking to**

7   **get paid for in this litigation.**

8   A.      I'm still suffering from the punch in the back

9   of the head.  I haven't thought about money or gaining

10  anything.  I can only tell you -- I haven't thought

11  about these things.

12  **Q.      I get that, but no one at APS punched you in the**

13  **back of the head right, that was a student that slapped**

14  **you?**

15  A.      Yes.

16  **Q.      This evaluation form that you were talking about**

17  **and the requirement for some sort of interim review, do**

18  **you recall that discussion?**

19  A.      You have to tell me --

20  **Q.      Let me restate it.  You were saying something**

21  **earlier about before you could get downgraded they had**

22  **to give you some sort of written warning or statement**

23  **that you needed to improve, that sort of thing.  Is that**

24  **what you said?**

25  A.      I believe that would have been fair.

Page 184

1    Q.       Okay.  But it's not a requirement?  It would
2    have been fair, but it's not a requirement?
3                     MR. GILBERT:  Objection.
4    A.       It's how I operated.  It's how I did my
5    evaluations.
6                     MR. McLANDRICH:  Okay.  Mr. Garnett, I
7    think that's all I have for you.  I appreciate your
8    time.
9                     MR. GILBERT:  I e-mailed you the sheet
10   that he referred to.  We don't object to it.  It's just
11   things that he had written down.
12                    MR. McLANDRICH:  Let's address that
13   very briefly here.  We don't need to mark that I don't
14   think and I don't know how we could as we sit here.
15   BY MR. McLANDRICH:
16   Q.       Mr. Garnett, it says on this handwritten sheet
17   here, and you can look at your copy there --
18                    MR. GILBERT:  John, if you want to
19   mark it as a joint Exhibit, but I think for the sake of
20   the record we ought to at least mark it.
21                    MR. McLANDRICH:  We can forward it to
22   our friends at Tackla.
23                    MR. GILBERT:  You could mark a joint
24   Exhibit, but I just want to make sure that you have an
25   opportunity to exam it.

Page 185

1          MR. McLANDRICH:  I appreciate that.  I

2    sent it to Tackla, and hopefully they can make it an

3    Exhibit.

4                        - - - -

5        (Thereupon, Defendants' Exhibit L was marked for

6                      identification.)

7                        - - - -

8    BY MR. McLANDRICH:

9    Q.      If I come back to the video I can't see the

10   document.  Is that all right with everyone?

11   A.      Okay.

12   Q.      We're going to mark this as Defendant's Exhibit

13   L.  So, Mr. Garnett, looking at Defendant's Exhibit L it

14   says at the top "Matt Frame," right?

15   A.      Yes.

16   Q.      I'm sorry.  Thomas Frame.  These notes, do they

17   just relate to Mr. Frame?

18   A.      Yes.

19   Q.      And then --

20   A.      Well, I don't know.  It might say something

21   about Tara Bruce on there too.

22   Q.      You have it in front of you?

23   A.      I never read it.  When I picked that paper up I

24   never used it, so I'm reading it now.

25   Q.      Did you write this paper?

Page 186

1  A.      I had my wife write it for me.

2  **Q.      And she wrote it based on what?**

3  A.      What I was saying.

4  **Q.      So you told her what to write and she wrote it**

5  **down?**

6  A.      Yes.

7  **Q.      All right.  Well, go ahead and read it and then**

8  **let's discuss it.**

9  A.      Okay.  Thomas Frame, retaliation, lawn pool

10  workers to be disrespectful, lack of support, teaming up

11  with principal, patting pool worker on shoulders,

12  telling them they're doing a good job.  And then I have

13  why, because I sued the board in '02.  Friends in

14  management, that might have been for something totally

15  different.

16  **Q.      I was kind of wondering about that.  What does**

17  **that friends in management mean, do you have any idea?**

18  A.      That might have been not even part of this.

19                      MR. GILBERT:  That deals with another

20  subject matter?

21  A.      Yeah.  Totally different.

22  BY MR. McLANDRICH:

23  **Q.      Does that deal with this lawsuit?**

24  A.      No.  When I saw that I didn't even know what

25  that was.

1  Q.      And the link between those acts of retaliation

2  and the events in 2002, is there anything to add to that

3  beyond what we've already talked about?

4  A.      Say that again.

5  Q.      Sure.  The link between the events in 2002, the

6  lawsuit against the board in 2002 and those acts of

7  retaliation, the connection between those two things, in

8  other words, the facts that you believe those acts of

9  retaliation are because you sued the board, we talked

10  about that earlier and I wanted to give you the

11  opportunity to add any other basis that you believe he

12  allowed the pool workers to be disrespectful, or gave

13  you a lack of support or teamed up with the principal or

14  patted the pool workers on the shoulders and told them

15  they were doing a good job.  I want you to tell me if

16  there's any other reasons to believe that those events

17  or action are related to the 2002 lawsuit and events

18  beyond what you already told me?

19  A.      If there's any other events?

20  Q.      In other words, any other reasons to believe

21  those things are connected.

22                  MR. GILBERT:  We've gone through your

23  testimony.  Do you have any else to add?

24  A.      Not off the top of my head, no.

25                  MR. GILBERT:  Thank you.

Page 188

1                    MR. McLANDRICH:  All right.  That's

2      all I have for you, Mr. Garnett.

3                    MR. GILBERT:  Okay.  We'll read.

4                    MR. McLANDRICH:  Megan, go ahead and

5      write it up.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2   STATE OF OHIO,             )
                                )
 3   CUYAHOGA COUNTY.           )

 4   I, Megan A. Medved, a Notary Public within and for the

 5   State of Ohio, duly commissioned and qualified, do

 6   hereby certify that the within named witness, MARK

 7   GARNETT, was by me first duly sworn to testify to the

 8   truth, the whole truth and nothing but the truth in the

 9   cause aforesaid; that the testimony then given by the

10   witness was by me reduced to Stenotype in the presence

11   of said witness, afterwards transcribed upon a computer;

12   and that the foregoing is a true and correct

13   transcription of the testimony so given by the witness

14   as aforesaid.

15

16   I do further certify that this deposition was taken at

17   the time and place in the foregoing caption specified,

18   and was completed without adjournment.

19

20   I do further certify that I am not a relative, employee

21   of or attorney for any of the parties in the

22   above-captioned action; I am not a relative or employee

23   of an attorney of any of the parties in the

24   above-captioned action; I am not financially interested

25   in the action; and I am not, nor is the court reporting
```

Page 190

1 firm with which I am affiliated, under a contract as

2 defined in Civil Rule 28(D).

3

4 IN WITNESS HEREOF, I have hereunto set my hand and

5 affixed my seal of office at Cleveland, Ohio on

6 September 17th, 2020.

7

8

9

10 _____

11 Megan A. Medved, a Notary Public

12 in and for the State of Ohio.

13 My Commission expires 9/17/23

14

15

16

17

18

19

20

21

22

23

24

25

**Errata Sheet**

**Page 22, Line 23 – A. "Yes, when she gave me the rose, she hugged me"**

**Page 26, Line 24 – A.  Revise to say "I do have more recordings I haven't been able to locate with Mr. Ake lying about Ms. McNary, other conversations with Ms. Bruce ( her praising my work and about her last custodian and asking me if the other head custodian I worked with was white, trying to get Mikal out of the building because she knew I wanted to keep him there), me talking with Thomas Hill about teachers complaining about him, me calling downtown to Mr. Beverlin and him not taking my calls and  Mr. Kekela telling my assistant custodian to do a shittier job because Crouse kids were a bunch of animals....from what I can remember right now."**

**Page 33, Line 4 – A. "I heard they didn't get their CDL...."**

**Page 39, Line 9 – "I was given a muddy, zero turn mower that needed work, instead of a new one"**

**Page 49, Line 14 –  "I was not on leave when I received that downgraded evaluation in June of 2017 when Matt Frame told me that I could not bid on any buildings."**

**Page 52, Line 24 -  "...maybe I brought it up"—Should say, "I don't recall who brought it up"**

**Page 69, Line 8 – "She said I move slow in everything I do..."**

**Page 112, Line 19 – Add  " I don't understand the interpretation of these paragraph sections..."**

**Page 113, Line 19 -  Add  " I don't understand the interpretation of these paragraph sections..."**

**Page 117, Line 17 – Should say  "when I send my stuff down to Tom Kekela..."**

**Page 125, Line 5 – add, ... "That's when I thought someone told that student to hit me.."**

**Page 136, Line 16 – Should say Thomas Hill not Thomas Frame**

**Page 160, Line 3 -  add  "I was doing my job from seven to three"**

**Page 169, Lines 1 through 25 – I didn't fully understand the questions being asked.**

**Page 170, Lines 2 through 23 – I didn't fully understand the questions being asked.**

**Page 181, Line 17 –"I want to be compensated for pain and suffering due to being forced out of work through discrimination based on my age and retaliation.  Also for being denied opportunity to further my employment with APS, harassment and pay that I have missed by not being employed up to my retirement age and attorney fees"**

**Mark Garnett**

Mark D. Garnett          10-19-2020